**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 45092**

| | |
|---|---|
| THURSTON ENTERPRISES, INC., an Idaho corporation, | ) ) ) |
| Plaintiff-Respondent, and | ) ) ) |
| T3 ENTERPRISES, INC., an Idaho corporation, | ) ) ) |
| Plaintiff, v. | ) ) ) |
| SAFEGUARD BUSINESS SYSTEMS, INC., a Delaware corporation, | ) ) ) |
| Defendant-Appellant, and | ) ) ) |
| SAFEGUARD ACQUISITIONS, INC., et al., | ) ) ) |
| Defendants. | ) ) |

Boise, November 2018 Term

Filed: February 19, 2019

Karel A. Lehrman, Clerk

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Steven Hippler, District Judge.

The judgment of the district court is affirmed. Costs and attorney fees are awarded to Thurston.

Hawley Troxell Ennis & Hawley LLP, Boise and Weil, Gotshal & Manges LLP, Dallas, Texas, attorneys for appellant. Paul R. Genender argued.

Givens Pursley LLP, Boise and Mulcahy LLP, Irvine, California, attorneys for respondent. James M. Mulcahy argued.

_____

BEVAN, Justice

This appeal arises from Safeguard Business Systems, Inc.'s ("SBS") alleged breach of its distributorship agreement with Thurston Enterprises, Inc. ("Thurston"). After a jury trial

Thurston was awarded approximately $6.8 million in damages. SBS filed a motion for post-judgment relief, which the district court denied. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. FACTUAL BACKGROUND

On June 1, 1987, Thurston and SBS entered into a distributor agreement (the "Agreement"), which granted Thurston the right to solicit orders of Safeguard products designated as "Safeguard Systems" from customers. The Agreement granted Thurston the exclusive right to commissions on the sale of Safeguard products to customers located within the territory defined in the Agreement ("account protection rights"). The Agreement expressly prohibited Thurston from soliciting orders of Safeguard Systems from customers with whom other Safeguard distributors held account protection rights, but allowed SBS to sell Safeguard Systems within Thurston's territory through other "persons." If a distributor made a sale to another distributor's protected customer, it was SBS's practice to issue a rotation notice. The rotation notice informed both the infringing and the receiving party that commissions were being rotated, i.e., the commission would go to the distributor who had account protection over that customer rather than to the infringing party who actually made the sale.

Deluxe Corporation ("Deluxe") is one of the two largest check printers in the United States and it manufactures and/or provides various personalized products and services to small businesses, financial institutions, and consumers. Deluxe purchased SBS and discontinued all SBS manufacturing operations so that Safeguard Systems products could be manufactured by Deluxe. In 2008, Deluxe and SBS launched a Business Acquisitions and Merger ("BAM") program to acquire non-Safeguard affiliated distributorships. The BAM program had four objectives: (1) increase SBS's revenue and profits by acquiring distributors; (2) increase the sales of Deluxe manufactured products to SBS distributors, thereby increasing Deluxe's revenues and profits; (3) expand Deluxe's manufacturing capabilities and increase its manufacturing capacity utilization by acquiring new product lines that could be marketed across Deluxe and SBS's various sales channels; and (4) where Deluxe does not manufacture a product, maximize the amount of orders sent to preferred suppliers paying Deluxe rebates.

In 2013, Deluxe and SBS acquired Form Systems Inc., d/b/a/ DocuSource ("DocuSource") and Idaho Business Forms ("IBF"), two non-Safeguard distributors conducting business in the Pacific Northwest. DocuSource and IBF were in the same geographic market as

Thurston and sold a full line of non-Safeguard products that directly competed with those offered by SBS, and by Thurston as SBS's distributor. As part of the BAM due diligence process, Deluxe and SBS reviewed all aspects of DocuSource and IBF's businesses, including their customer lists. This was done through a "customer scrub," intended to determine the extent of account overlap between DocuSource and IBF and any current Safeguard distributors. SBS's in-house counsel, Michael Dunlap, sought to resolve any potential account protection violations by getting the affected distributors to either share the account with the new distributor, or sell the commission rights to SBS, which would then sell the rights to the new distributor.

In February 2014, Mr. Dunlap, who also served as corporate secretary, negotiated with Mr. Roger Thurston[1] ("Mr. Thurston"), Thurston's principal, to sell some of Thurston's account protection rights to SBS. In March 2014, Mr. Thurston sold SBS the commission rights to nine customers for $32,600. Mr. Thurston reached this valuation by looking at Thurston's own sales for the customers at issue. Mr. Dunlap did not disclose IBF's sales figures to the same customers, or what products were sold to them. After the sale occurred Mr. Thurston learned that IBF had significant sales to the customers, and claimed that had he known this information before the sale he would have increased the price "exponentially."

## B. PROCEDURAL BACKGROUND

These proceedings were started when another distributor, T3 Enterprises, Inc., ("T3")[2], filed a complaint alleging various tort claims against SBS and several other defendants. On September 16, 2014, Thurston joined the suit by filing an amended complaint, alleging claims for: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) tortious interference; (4) intentional interference with prospective economic advantage; (5) conversion; and (6) accounting.

On January 20, 2016, Thurston filed a discovery motion to challenge several of SBS's privilege designations and redactions, alleging SBS and Deluxe had engaged in the "rampant use

---

[1] While Mr. Thurston has been referred to by SBS as the "owner" of Thurston Enterprises, Inc., and he holds the role as principal in the corporation, Thurston Enterprises is a business entity independent of Roger Thurston. It will be referred to as "Thurston" throughout this opinion. To avoid confusing Thurston Enterprises with Roger Thurston, Roger will be referred to as "Mr. Thurston" throughout this opinion.

[2] On October 21, 2014, SBS moved to compel arbitration against T3 pursuant to the terms of their agreement. The district court granted SBS's motion and severed T3's claims against SBS so that they could proceed to arbitration; however, the district court allowed Thurston's claims (as well as T3's claims against the other defendants) to proceed in district court.

3

of privilege claims" to cover up key evidence. Trial counsel for SBS conducted a new review and withdrew the claim of privilege for all but forty-one documents. The court reviewed the remaining documents *in camera* and rejected privilege for nearly all, finding that they concerned "factual matters and business advice about the cross-over customers made in Mr. Dunlap's capacity as corporate secretary rather than purely legal issues."

On June 21, 2016, Thurston filed a third amended complaint which: (1) dismissed all defendants except SBS and Deluxe[3] with prejudice; and (2) included a new cause of action by Thurston against SBS for fraud in the inducement and breach of the parties' March 2014, agreement. Thurston was subsequently granted leave to amend the complaint to also request punitive damages.

On August 26, 2016, Thurston and SBS filed cross-motions for partial summary judgment. On October 21, 2016, the district court entered its memorandum decision which denied SBS's motion, but granted Thurston's motion in part, holding that the Agreement was unambiguous and SBS breached it by failing to rotate commissions on sales IBF and DocuSource made to Thurston's protected customers. The district court determined that the resulting damage from such unpaid commissions was in dispute; as such, it was a matter for the jury to consider.

A jury trial was held between November 29 and December 21, 2016. On December 15, 2016, after Thurston finished with its case-in-chief, SBS and Deluxe moved for a directed verdict. The district court denied the motion. At the conclusion of trial the jury fully exonerated Deluxe and awarded Thurston $1,625,985 for its claims against SBS; the specific amounts awarded by the jury were broken down as follows: $494,526 for breach of the account protection clause; $156,628 for breach of the pricing schedule clause; $532,431 for breach of the implied covenant of good faith and fair dealing; and $442,400 for fraud in the inducement. The jury also awarded Thurston $4,750,000 in punitive damages, which the district court reduced to $4,408,071 to comply with Idaho Code section 6-1604. On January 13, 2017, the district court entered judgment in favor of Thurston against SBS for $6,034,056.

On January 27, 2017, SBS filed a motion for post-judgment relief requesting that the district court: (1) eliminate the $532,431 award for diminution in value because that theory of

---

[3] On August 26, 2015, Thurston had filed a second amended complaint to include allegations against Deluxe.

4

loss was unsupported by the evidence; (2) reduce the award for breach of account protection by $291,010 because the future losses were premised on impermissibly speculative expert testimony; (3) eliminate the pricing preference verdict as legally and factually unfounded as well as the damages of $156,628 as excessive and unsupported; (4) dismiss the fraudulent inducement claim due to a failure of proof that Thurston did not know he lacked sales information for IBF or DocuSource and eliminate the punitive damages because of the lack of malice; and (5) reject the jury's award of punitive damages for breach of contract because there was no evidence SBS had an "extremely harmful state of mind" towards Thurston. The district court denied SBS's motion for post-judgment relief on all grounds. On May 5, 2017, the district court awarded Thurston $758,593.74 in attorney fees and costs. SBS timely appealed to this Court.

## II. ISSUES ON APPEAL

1.      Whether the district court erred in ruling as a matter of law that Thurston's account protection rights were breached under the Agreement.

2.      Whether the district court's ruling on SBS's attorney-client privilege was an abuse of discretion.

3.      Whether the district court erred in denying post-judgment relief regarding the jury's finding of fraud in the inducement of the March 2014 agreement.

4.      Whether the district court erred in denying post-judgment relief regarding the jury's finding that SBS breached the "pricing guarantee" in the Agreement.

5.      Whether the district court erred as to the good faith and fair dealing claim.

6.      Whether the district court erred in denying post-judgment relief regarding the jury's award of punitive damages.

7.      Whether the district court erred in denying post-judgment relief regarding the jury's award of future damages.

8.      Whether either party is entitled to attorney fees on appeal.

## III. STANDARD OF REVIEW

### A. SUMMARY JUDGMENT

This Court applies the same standard of review that was used by the trial court in ruling on a motion for summary judgment. *Lincoln Land Co., LLC v. LP Broadband, Inc*., 163 Idaho 105, 108, 408 P.3d 465, 468 (2017). Summary judgment is proper if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a). "[T]his Court construes disputed facts, and all reasonable inferences that can be drawn from the

5

record, in favor of the non-moving party." *Grabicki v. City of Lewiston*, 154 Idaho 686, 690, 302 P.3d 26, 30 (2013) (internal citation omitted).

### B. DISCOVERY AND EVIDENTIARY MATTERS

"When reviewing the trial court's evidentiary rulings, this Court applies an abuse of discretion standard." *Edmunds v. Kraner*, 142 Idaho 867, 871, 136 P.3d 338, 342 (2006). These include trial court decisions admitting or excluding expert witness testimony and excluding evidence because it is more prejudicial than probative. *Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 50–51, 995 P.2d 816, 820–21 (2000) (internal quotations and citations omitted). "Error is disregarded unless the ruling is a manifest abuse of the trial court's discretion and affects a substantial right of the party." *Id.* The test for an abuse of discretion is

> whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason.

*Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

### C. JUDGMENT NOTWITHSTANDING THE VERDICT

"In determining whether a directed verdict or judgment n.o.v. should have been granted, the appellate court applies the same standard as does the trial court which passed on the motion originally." *Quick v. Crane*, 111 Idaho 759, 764, 727 P.2d 1187, 1192 (1986) (internal citation omitted).

> When a trial judge receives such a motion, the judge begins the inquiry by asking him or herself whether there is substantial evidence in the record upon which the jury could properly find a verdict for the party against whom the judgment notwithstanding the verdict is sought. *See Quick v. Crane*, 111 Idaho 759, 763, 727 P.2d 1187, 1191 (1986). The judge's task in answering this question is to review all the evidence and draw all the reasonable inferences therefrom in the light most favorable to the non-moving party. *Id.* at 764, 727 P.2d at 1192. (The party seeking a judgment notwithstanding the verdict admits the truth of all the other side's evidence and every legitimate inference that can be drawn from it. *Stephens v. Stearns*, 106 Idaho 249, 252–53, 678 P.2d 41, 44–45 (1984).) The judge is not an extra juror, though; there is no weighing of evidence or passing on the credibility of witnesses or making of independent findings on factual issues. *Gmeiner v. Yacte*, 100 Idaho 1, 4, 592 P.2d 57, 60 (1979). Instead, the judge must determine whether the evidence is substantial—that is, whether it is of sufficient quality and probative value that reasonable minds could arrive at the same conclusion as did the jury. *Mann v. Safeway Stores, Inc.*, 95 Idaho 732, 736, 518 P.2d 1194, 1198 (1974).

*Schwan's Sales Enterprises, Inc. v. Idaho Transp. Dep't*, 142 Idaho 826, 830, 136 P.3d 297, 301 (2006). "Whether the trial court should have entered a judgment notwithstanding the verdict is purely a question of law." *Id.*

## IV. ANALYSIS

**A.      The district court correctly decided that SBS breached Thurston's account protection rights under the Agreement as a matter of law.**

The district court entered summary judgment in favor of Thurston on its claim that SBS breached the account protection provision of the Agreement after finding the provision was not ambiguous. The account protection provision stated:

> For so long as is specified in Attachment B, you shall have the exclusive right to the commissions generated on sales of Safeguard Systems to any customer listed on Attachment B. This exclusive right to commissions applies to all new and repeat Safeguard System sales to each customer until this Agreement is terminated (see paragraph 7).

SBS argued that account protection—as a matter of plain language and historical practice—applied only to the specific products a distributor was first to successfully solicit from a particular account. SBS argued that any other interpretation would enable Thurston to receive commissions where it solicited the sale of a single envelope from one biller in an entity like St. Luke's Hospital and sit back to receive commissions on all sales to the entire hospital system by others even if Thurston did not offer the products (*e.g.*, medical ID bands) or have the capabilities demanded by the customer (*e.g.*¸warehousing/drop shipping). On appeal SBS contends that the district court's grant of summary judgment was erroneous because: (1) a product-specific interpretation is supported by the Agreement's plain language; (2) there was a factual issue of whether the products sold by IBF and DocuSource were "Safeguard Systems" under the Agreement; and (3) there is a latent ambiguity in the term "customer".

As a threshold matter we reject SBS's position that there is a latent ambiguity in the term "customer" because this argument was not argued before the district court. *Kolar v. Cassia Cnty. Idaho*, 142 Idaho 346, 350, 127 P.3d 962, 966 (2005) ("we will not entertain issues or theories not raised in the court below"). We will only address the first two arguments.

The purpose of interpreting a contract is to determine the intent of the contracting parties at the time the contract was formed. *Shawver v. Huckleberry Estates, L.L.C.*, 140 Idaho 354, 361, 93 P.3d 685, 692 (2004) (internal citation omitted). In determining the intent of the parties, the

contract is to be viewed as a whole. *Daugharty v. Post Falls Highway Dist.*, 134 Idaho 731, 735, 9 P.3d 534, 538 (2000).

> [T]his Court begins with the document's language. In the absence of ambiguity, the document must be construed in its plain, ordinary and proper sense, according to the meaning derived from the plain wording of the instrument. Interpreting an unambiguous contract and determining whether there has been a violation of that contract is an issue of law subject to free review. A contract term is ambiguous when there are two different reasonable interpretations or the language is nonsensical. Whether a contract is ambiguous is a question of law, but interpreting an ambiguous term is an issue of fact.

*Phillips v. Gomez*, 162 Idaho 803, 807, 405 P.3d 588, 592 (2017) (quoting *Potlatch Educ. Ass'n v. Potlatch Sch. Dist. No. 285*, 148 Idaho 630, 633, 226 P.3d 1277, 1280 (2010)).

There are two types of ambiguity, patent and latent. *Knipe Land Co. v. Robertson*, 151 Idaho 449, 455, 259 P.3d 595, 601 (2011). A patent ambiguity is an ambiguity clear from the face of the instrument in question. *Id*. On the other hand, "[a] latent ambiguity exists where an instrument is clear on its face, but loses that clarity when applied to the facts as they exist." *Id*. If the Court finds an ambiguity, the interpretation of the contract term is a question for the fact-finder. *Id*. If the Court finds no ambiguity, "the document must be construed in its plain, ordinary and proper sense, according to the meaning derived from the plain wording of the instrument." *Potlatch*, 148 Idaho at 633, 226 P.3d at 1280 (quoting *C & G, Inc. v. Rule*, 135 Idaho 763, 765, 25 P.3d 76, 78 (2001)). Interpreting an unambiguous contract and determining whether there has been a violation of that contract is an issue of law. *Id*. (internal citation omitted).

The Agreement, in relevant part, provides:

1.  PRODUCTS

    You shall have the right in your territory to act as our sales distributor (representative) to solicit the sale of those products and services defined in the Addenda attached hereto ("Safeguard Systems") in accordance with the price schedules published by Safeguard and on the terms and conditions set by Safeguard from time to time.

2.  TERRITORY

    Your territory is the geographical area described in Attachment A. You are not authorized to represent Safeguard or solicit sales of Safeguard Systems outside this territory, and Safeguard may appoint additional persons to solicit sales of Safeguard Systems inside the territory.

3.  ACCOUNT PROTECTION RIGHTS

8

For so long as is specified in Attachment B, you shall have the exclusive right to the commissions generated on sales of Safeguard Systems to any customer listed on Attachment B. This exclusive right to commissions applies to all new and repeat Safeguard System sales to each customer until this Agreement is terminated (see paragraph 7).

Further, Attachment B to the Agreement provides:

You shall have the exclusive right to the commissions on sales of Safeguard Systems to: (i) each customer in you sales territory described in Attachment A whose first order of Safeguard Systems is directly a result of your efforts and credited to you . . . .

\*\*\*\*

In addition, your exclusive right to commissions on sales of Safeguard Systems to any customer shall expire if that customer has not purchased any Safeguard System and paid in full for such purchase, within thirty-six (36) months after the invoice date of such customer's last prior purchase of any Safeguard System.

There were originally seven addenda to the Agreement, which each described a different product for which Thurston had a right to solicit orders. On November 26, 2000, Addendum No. 8 was added to the Agreement, which granted Thurston the right to offer "sourced or brokerage products" defined as:

Ancillary business forms, checks or other business products that are not manufactured or offered by Safeguard, including those through their preferred sourced relationships, but which will, from time to time, be made available for sale by Safeguard through Distributors to the small business marketplace. . . .

Regarding Thurston's commission, Addendum No. 8 provided:

Each product covered by this Addendum shall be sold and billed to the customer at the price agreed to by the Distributor and communicated to Safeguard. Safeguard shall maintain a schedule of handling and processing charges for BODP [Bill Only Distributor Paid] orders, which may from time to time be changed by Safeguard. Your commission will be 1) the amount billed to the end-user customer, as agreed to between the customer and the Distributor and communicated to Safeguard, less 2) the applicable processing charge as determined by the schedule then in effect, and less 3) sales tax, subject to applicable reversal provisions for Sourced or Brokerage orders. . . .

Addendum No. 9 gave Thurston the right to solicit orders for payroll processing products including, but not limited to, W-2 forms.

This Court has free review over the district court's holding that the language in the agreement was unambiguous. *See Swanson v. Beco Constr. Co., Inc.*, 145 Idaho 59, 62, 175 P.3d

9

748, 751 (2007) ("free review" over ambiguity). In granting Thurston's motion for summary judgment the district court held:

> Under the plain language of Thurston's RDA [Regional Distributor Agreement], Thurston is entitled to commissions on sales of any Safeguard product or service (i.e., "Safeguard Systems") to any customers over which Thurston holds account protection rights; that is, where the first order of a Safeguard System by a customer within Thurston's territory was a result of Thurston's efforts and credited to Thurston. By failing to pay or rotate commissions to Thurston on any such sales made by IBF and DocuSource, Safeguard breached the RDA, thereby causing Thurston damages.

We agree with the district court that the account protection language in the Agreement is not ambiguous. The plain language of the Agreement provides that "[Thurston] shall have the exclusive right to the commissions generated on sales of Safeguard Systems to [each customer in [Thurston's] sales territory . . . whose first order of Safeguard Systems is directly a result of [Thurston's] efforts and credited to [Thurston]. This exclusive right to commissions applies to *all new and repeat Safeguard System sales* until this Agreement is terminated." (Emphasis added). This right to commissions continues for thirty-six months after the invoice date of the customer's last purchase of a Safeguard System. If the customer purchases a new Safeguard System within the thirty-six months—regardless of whether that purchase is from Thurston—that period starts over. If another Safeguard distributor sold to one of Thurston's protected customers in that period, SBS's practice was to rotate the commission on the sale back to Thurston.

SBS's product specific interpretation adds language into the Agreement that is not there. There is no language limiting Thurston's right to commissions based on what specific product it sold. Instead, if the product qualifies as a Safeguard System, Thurston is entitled to the commission on the sale. Further, the Agreement's use of the term "Safeguard System" makes it clear that commissions on all products and services offered through SBS and its preferred suppliers, including Deluxe, are encompassed by the exclusive right. As a result, even though W-2 processing products were historically sold by IBF, after the BAM acquisition, they became a Safeguard System. Under the plain language of the Agreement, Thurston was entitled to commissions on the sale of such products to any customer in its territory to whom Thurston first sold *any* Safeguard System and which was credited to Thurston by SBS. We affirm the district court's grant of summary judgment holding that SBS breached the Agreement by failing to rotate IBF and DocuSource commissions on Thurston's protected accounts.

10

**B.** **SBS waived its right to object to the district court's ruling on attorney-client privilege.**

Approximately eight months before trial, the district court conducted an *in camera* review of forty-one documents that SBS claims were protected by the attorney-client privilege and found "that the majority concerned factual matters and business advice about the cross-over customers made in Dunlap's capacity as corporate secretary rather than purely legal issues." The district court thus ordered that SBS produce several of these documents to Thurston. On appeal both parties agreed that there were only seven exhibits at issue; however, at the beginning of trial, SBS stipulated to the admission of all seven. Because the district court decision concerned a discovery matter, that decision stood on its own, independent of whether the documents were admissible at trial. By stipulating to admit the documents at trial, SBS waived any right to challenge the district court's privilege ruling on appeal.

This Court's opinion in *Saint Alphonsus Diversified Care, Inc. v. MRI Associates, LLP*, 148 Idaho 479, 224 P.3d 1068 (2009) helps explain this result. There, Saint Alphonsus brought a motion to strike a document that contained matters it contended were legal advice and subject to the attorney-client privilege. *Id.* at 492, 224 P.3d at 1081. The trial court denied the motion to strike, finding that the statements were not covered by attorney-client privilege. *Id.* Later, prior to trial, Saint Alphonsus brought a motion in limine to preclude admission of the allegedly privileged statements; however, Saint Alphonsus failed to argue its privilege claims during a motion hearing involving twenty-nine other motions. *Id.* at 493, 224 P.3d at 1082. In ruling on the motion, the district court did not address the attorney-client privilege claim, and we noted that "[t]he court apparently overlooked that portion of the motion because nobody mentioned it or argued attorney-client privilege during oral argument on the motion.*" Id.* at 494, 224 P.3d at 1083. Saint Alphonsus then filed another motion in limine, but it failed to bring the attorney-client privilege issue to the court's attention other than through its written motion. *Id.*

We held that Saint Alphonsus had failed to preserve the attorney-client privilege issue for appeal, *even though* it had received an adverse ruling when the trial court denied the motion to strike. We stated:

> If the trial court unqualifiedly rules on the *admissibility* of evidence prior to trial, no further objection is necessary in order to preserve the issue for appeal. If the trial court does not do so, however, then the party opposing the evidence must continue to object as the evidence is presented. *By failing to object when the*

11

*memorandum was offered into evidence during the trial, St. Alphonsus waived any objection.*

*Id.* (emphasis added) (internal citations omitted).

This holding is directly on point regarding SBS's claim about its allegedly privileged documents here. While SBS received an adverse discovery ruling when the court ordered the documents produced, it did not receive an unqualified ruling on the *admissibility* of those documents at any time before trial. By stipulating to the documents' admissibility, SBS waived any objection it had to the district court's privilege ruling. *State v. Ellington*, 151 Idaho 53, 64, 253 P.3d 727, 738 (2011) ("a party waives an objection to the admission of evidence by failing to object at the time of its admission.").

**C.    The district court properly denied SBS's motion for post-judgment relief on Thurston's claim for fraud in the inducement of the March 2014 agreement because the jury's finding was supported by substantial evidence.**

SBS asserts that the jury's award of $442,400 for Thurston's fraudulent inducement claim should be vacated because it was not supported by the evidence. SBS argues that Mr. Thurston chose to enter into the March 2014 agreement knowing he did not have IBF sales information on the accounts he was selling. A party alleging fraud must prove the following nine elements by clear and convincing evidence:

(1) a statement of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent to induce reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) the hearer's right to rely; and (9) consequent and proximate injury.

*Country Cove Dev., Inc. v. May*, 143 Idaho 595, 600, 150 P.3d 288, 293 (2006) (citing *Lettunich v. Key Bank Nat'l Ass'n*, 141 Idaho 362, 368, 109 P.3d 1104, 1110 (2005)).

The element at issue is "the hearer's ignorance of the falsity of the statement." SBS argues that before entering into the March 2014 agreement, Mr. Thurston was fully aware IBF was still selling to all nine overlapping organizations. SBS contends that the following facts demonstrate that Mr. Thurston agreed to sell his commission rights to the affected accounts while knowing that no sales data had been disclosed:

- Mr. Thurston was a long-time sophisticated distributor who bought several other distributorships over the years and knew how to value accounts.

- As a long-time competitor of IBF prior to SBS's purchase, Mr. Thurston was very familiar with IBF and already knew it was "in the accounts we have."

12

- During the October 3, 2013, in-person meeting between Mr. Thurston and Mr. Dunlap at a dinner in Boise, Mr. Thurston became aware that Mr. Dunlap had historical data on IBF.

- By October 15, 2013, Mr. Thurston was specifically informed of at least 20 of his current customers overlapping with IBF due to a marketing letter IBF sent to those customers.

- Mr. Thurston acknowledged he did not receive any sales figures for IBF or DocuSource at the time he entered into the March 2014 agreement, and admitted he knew he was negotiating based on his company's own sales to the accounts at issue.

- Nevertheless, Mr. Thurston negotiated a significantly higher amount for one account (Norco) because he at least suspected IBF had ongoing sales to that customer much greater than his own.

SBS also relies heavily on an email from Mr. Thurston to Mr. Dunlap for its argument that Mr. Thurston was "clearly" aware of IBF's post-acquisition sales to his protected customers. The email provides "[s]ince the client list we have been going through is based on sales since August 27 [the date IBF was acquired], I imagine that there are specifics associate [sic] with those sales and accounts." Even so, it is undisputed that SBS concealed IBF and DocuSource's sales to Thurston's protected customers prior to the execution of the March 2014 agreement. Indeed, Mr. Dunlap and Mr. Thurston both testified that no information relating to IBF sales on Thurston's protected accounts was exchanged before the March 2014 agreement.

On review, this Court applies the same standard as the trial court; thus, all reasonable inferences must be drawn in the light most favorable to Thurston as the non-moving party. *Quick v. Crane*, 111 Idaho at 764, 727 P.2d at 1192. We do not find that any of the above statements conclusively demonstrate that Mr. Thurston was aware of IBF sales to Thurston's protected accounts after SBS acquired IBF. Drawing all inferences in favor of Thurston, the jury could have reasonably found that Mr. Thurston's comments did not distinguish between knowledge of IBF sales to Thurston's protected accounts prior to IBF's acquisition by SBS and after IBF's acquisition.

This holding is consistent with the district court's determination that SBS failed to establish that Mr. Thurston knew that IBF was selling Safeguard Systems to protected accounts or that Mr. Thurston knew SBS was failing to disclose such sales. Instead, the evidence simply established that Mr. Thurston knew IBF had sold products to Thurston's protected accounts (i.e., had common customers) before becoming a Safeguard distributor. SBS's normal practice to

13

issue a rotation notice every time a sale of a Safeguard product was made to a distributor's protected account supports the inference that Mr. Thurston did not know that IBF was continuing to sell to Thurston's protected accounts prior to executing the March 2014 agreement. Thurston never received a rotation notice regarding IBF's sales as a distributor for SBS. This Court cannot reweigh the evidence. *See Schwan's Sales Enterprises v. Idaho Transp. Dep't*, 142 Idaho 826, 830, 136 P.3d 297, 301 (2006) ("[t]he judge is not an extra juror, though; there is no weighing of evidence or passing on the credibility of witnesses or making of independent findings on factual issues."). We hold that the district court correctly denied SBS's motion for post-judgment relief on Thurston's fraud in the inducement claim because the jury's verdict was supported by substantial evidence.

**D.      The district court properly denied SBS's motion for post-judgment relief on Thurston's claim that SBS breached the pricing guarantee in the Agreement because the jury's finding was supported by substantial evidence.**

SBS also argues that the jury's award of $156,628 for breach of the pricing schedule clause should be vacated because it is not supported by the evidence.

The following provision in the Agreement is in dispute:

1. PRODUCTS

You shall have the right in your territory to act as our sales distributor (representative) to solicit the sale of those products and services defined in the Addenda attached hereto ("Safeguard Systems") in accordance with the price schedules published by Safeguard and on the terms and conditions set by Safeguard from time to time.

First SBS argues that the district court erred when it ruled the pricing provision was ambiguous; however, in opposition to Thurston's motion for summary judgment, SBS argued that the clause was ambiguous, contending there was a factual dispute about the interpretation of the provision. The district court agreed with SBS and found the provision to be ambiguous. Thus, the claim went before the jury as the trier of fact, which found that Thurston proved its claim for breach of the Agreement under the "pricing schedule" clause and awarded Thurston $156,628 in damages.

After trial, SBS moved for post-judgment relief arguing that this language guaranteed no uniformity of price. SBS argued that testimony from trial demonstrated that the Agreement did not guarantee the same pricing among distributors. SBS's president, Mr. Sorrenti, testified there is no uniform pricing clause in SBS distributorship agreements and that "[a]t certain volumes,

you get discounts." Even so, the district court denied SBS's request for relief, finding that the jury, as the trier of fact, was appropriately instructed (1) that the terms of the provision were in dispute, and (2) by providing it the rules of contract interpretation to determine the parties' intent. The jury having been properly instructed, and having reached a conclusion based on "evidence of sufficient quantity and probative value that reasonable minds could have reached a similar conclusion," *Knipe Land Co. v. Robertson*, 151 Idaho 449, 454, 259 P.3d 595, 600 (2011), we are not in a position to weigh the evidence or pass on the credibility of witnesses on appeal.

The district court held that the following testimony was sufficient evidence to support the jury's finding that there was a breach of the pricing provision: (1) Mr. Taylor, Thurston's expert, testified that SBS offered IBF a base price on two products which was approximately 40% less than that offered to Thurston; and (2) both Mr. Thurston and Ms. Teply[4] testified that they understood the preferential pricing clause to give them the right to the same base price schedules other distributors received. The district court determined that while Mr. Sorrenti's testimony contradicted that of Mr. Thurston and Ms. Teply, the jury was "free to disregard that testimony." In considering a motion for judgment notwithstanding the verdict the court does not reweigh the evidence considered by the jury; rather, it considers whether there was substantial evidence to support the jury's verdict. *See Schwan's Sales Enterprises*, 142 Idaho at 830, 136 P.3d at 301 (internal citation omitted). We hold that the evidence highlighted by the district court is sufficient to support the jury's finding that SBS breached the pricing provision in the Agreement. Thus, the district court properly denied SBS's motion for post-judgment relief.

**E.** **The district court properly denied SBS's motion for post-judgment relief on Thurston's claim for good faith and fair dealing because the jury's finding was supported by substantial evidence.**

Next, SBS contends the jury's award of $532,431 to Thurston for damages caused by SBS's breach of the implied covenant of good faith and fair dealing should be vacated.

"Idaho law recognizes a cause of action for breach of an implied covenant of good faith and fair dealing." *Jenkins v. Boise Cascade Corp.*, 141 Idaho 233, 242, 108 P.3d 380, 389 (2005) (internal citation omitted).

---

[4] Ms. Teply is a Safeguard distributor under a franchise agreement between T3 Enterprises, Inc. and SBS. She formed the T3 business as a closely held corporation.

No covenant will be implied which is contrary to the terms of the contract negotiated and executed by the parties. *First Security Bank of Idaho v. Gaige*, 115 Idaho 172, 765 P.2d 683 (1988); *Clement v. Farmers Ins. Exchange*, 115 Idaho 298, 766 P.2d 768 (1988) (an implied covenant of good faith and fair dealing cannot override an express provision in a contract). The covenant requires "that the parties perform in good faith the obligations imposed by their agreement," *Badgett v. Security State Bank*, 116 Wash.2d 563, 807 P.2d 356, 356 (1991), and a violation of the covenant occurs only when "either party . . . violates, nullifies or significantly impairs any benefit of the . . . contract. . . ." *Sorensen v. Comm Tek, Inc.*, 118 Idaho 664, 669, 799 P.2d 70, 75 (1990); *Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 778 P.2d 744 (1989).

*Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 121 Idaho 266, 288, 824 P.2d 841, 863 (1991).

SBS asserts that the district court erred during three stages of litigation: (1) denying SBS's motion for summary judgment; (2) allowing Thurston to change the remedy he was seeking from the right to force SBS to purchase the distributorship at its full current value—i.e., $798,647—to a theory that SBS's breach did not destroy Thurston's business but instead transformed it in to a non-Safeguard distributorship, causing a two-thirds depreciation in value—i.e., $532,431; and (3) denying SBS's motion for post-judgment relief under the devaluation theory because it was not supported by substantial evidence.

> a. *This Court will not review the district court's denial of SBS's motion for summary judgment.*

SBS argues that Thurston's good faith and fair dealing claim should have been dismissed at summary judgment because it was duplicative of the other contract breaches and contrary to the express terms of the contract; however, we do not review the denial of a motion for summary judgment when a party has had a trial on the merits. We have consistently explained the rationale for this rule:

> [B]y entering an order denying summary judgment, the trial court merely indicates that the matter should proceed to trial on its merits. *The final judgment in a case can be tested upon the record made at trial, not the record made at the time summary judgment was denied. Any legal rulings made by the trial court affecting that final judgment can be reviewed at that time in light of the full record.* This will prevent a litigant who loses a case, after a full and fair trial, from having an appellate court go back to the time when the litigant had moved for summary judgment to view the relative strengths and weaknesses of the litigants at that earlier stage. Were we to hold otherwise, one who had sustained his position after a fair hearing of the whole case might nevertheless lose, because he had failed to prove his case fully on the interlocutory motion.

16

*Am. Bank v. BRN Dev., Inc.*, 159 Idaho 201, 206, 358 P.3d 762, 767 (2015) (quoting *Garcia v. Windley*, 144 Idaho 539, 542, 164 P.3d 819, 822 (2007)). We therefore decline to review the district court's denial of SBS's motion for summary judgment.

> b. *The district court did not abuse its discretion in allowing Mr. Thurston to present evidence concerning the value of his distributorship.*

Next, SBS argues that the district court impermissibly allowed Thurston to shift its damage theory midway through trial from a "forced sale theory" to a new theory that Thurston's business was transformed into a non-Safeguard distributorship. SBS's argument lacks merit. From the time Thurston joined the case by amended complaint it sought damages for "business devaluation suffered by Thurston Enterprises" arising from SBS's breach of its good faith and fair dealing.

Evidence regarding the value of Thurston's business was presented mainly through the testimony of Mr. Taylor, Mr. Thurston, and Mr. Sorrenti. It is undisputed that Mr. Taylor only provided testimony about the value of Thurston's distributorship prior to the harm but not the devaluation. Mr. Taylor testified that the value of Thurston's entire business was $798,646. Mr. Taylor came to this figure by applying SBS's metric of "one times annual revenue." Mr. Thurston and Mr. Sorrenti both confirmed that SBS uses this metric to value Safeguard distributorships.

Mr. Thurston then testified that without Safeguard's contractual benefits, i.e., account protection, the value of an independent distributorship is around one-third of the price of a Safeguard distributorship. SBS claims that Mr. Thurston's testimony "invented a brand new theory mid-way through trial that the express contract breaches did not destroy its business, but instead transformed it into a non-Safeguard distributor causing a two-thirds depreciation in value." We review the district court's decision to permit Mr. Thurston's testimony for an abuse of discretion. *Edmunds v. Kraner*, 142 Idaho 867, 871, 136 P.3d 338, 342 (2006). The test for an abuse of discretion is:

> [W]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason.

*Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

17

We hold the district court did not abuse its discretion in allowing Mr. Thurston to testify about the devaluation of his distributorship. As set forth previously, the legal theory pursued from complaint to verdict was that SBS's actions had impaired the value of Thurston's distributorship. Mr. Thurston was competent to provide testimony on the value of his business. *Schroeder v. Partin*, 151 Idaho 471, 477, 259 P.3d 617, 623 (2011) ("It is a settled rule in Idaho that the owner of property is a competent witness to its value, as he is presumed to be familiar with its value by reason of inquiries, comparisons, purchases and sales."). SBS even conceded that "Mr. Thurston was a long-time sophisticated distributor who bought several other distributorships over the years and *knew how to value accounts*" in its opposition to Thurston's fraud in the inducement claim. Moreover, Mr. Thurston's testimony that non-Safeguard distributorships were worth less than Safeguard distributorships was confirmed by Mr. Sorrenti as well as Scott Sutton, SBS's vice president of franchise development, who testified that SBS places a lower value on non-Safeguard distributorships. This evidence was not a surprise to SBS and thus the district court did not abuse its discretion in permitting the jury to consider this testimony in evaluating the good faith and fair dealing claim.

        *c. The district court correctly denied SBS's motion for post-judgment relief.*

In denying SBS's motion for post-judgment relief the district court recognized that the evidence before the jury regarding the breach of the implied covenant was presented through Mr. Taylor, Mr. Thurston, and Mr. Sorrenti. Mr. Thurston and Mr. Sorrenti both testified that the metric of "one times annual revenue" was used by SBS to value Safeguard distributorships. Mr. Taylor then applied this metric to calculate the value of Thurston's business, and based on Thurston's sales data from December 1, 2014, through November 30, 2015, he determined that the distributorship value was $798,646. Mr. Thurston testified that the value of an independent distributorship is around one-third of the price of a Safeguard distributorship. Mr. Sorrenti confirmed that the valuation metrics differ between independent distributors and those in the Safeguard network. This testimony supports the jury's award of $532,431 for SBS's breach of the good faith and fair dealing claim—two-thirds diminution as to the amount Mr. Taylor testified was Thurston's entire business.

Ultimately, the district court held

        The valuation metric and figures presented to the jury here were appropriate given the facts and circumstances of the case—they are metrics used

18

by Safeguard itself in valuing both its own and independent distributorships. Indeed, Mr. Thurston, as the owner Thurston Enterprises, is "a competent witness to its value, as he is presumed to be familiar with its value by reason of inquiries, comparisons, purchases and sales." *Schroeder v. Partin*, 151 Idaho 471, 477, 259 P.3d 617, 623 (2011). *See also, Mercury Marine Div. of Brunswick Corp. v. Boat Town U.S.A.*, Inc., 444 So.2d 88 (Fla. Dist. Ct. App. 1984) (holding that owner of corporate franchise was competent to testify as to loss of business value suffered by franchisee due to franchisor's breach).

. . . . The jury was presented with evidence of the value or marketability of the business, the two metrics used by [SBS] and Mr. Thurston in valuing Safeguard distributors versus independent distributors, and heard testimony from Mr. Thurston that he valued his business at zero given [SBS's] breaches; namely, his lack of account protection and competition from IBF. This evidence is not speculative; rather, it is largely based on [SBS's] own practices and evidence of Thurston's sale and purchase history involving similar businesses. Drawing all inferences from this evidence in Thurston's favor, it was reasonable for the jury to conclude that [SBS's] breaches effectively transformed Thurston into a non-Safeguard distributor, and applying the valuation metric used for independent distributors, determine that, as a consequence of the breaches, Thurston was worth only 2/3 of its prior value.

The district court also held that while there was evidence that the account protection violations only affected a portion of Thurston's protected accounts, the jury was within its bounds to determine that the violations affected the overall marketability of the company since "exclusive" account protection and other contractual rights were breached by SBS. We agree with this reasoning so aptly stated by the district court and hold the jury's award of $532,431 is supported by substantial evidence. The district court properly denied SBS's motion for post-judgment relief on this claim.

**F.     The district court properly denied SBS's motion for post-judgment relief on Thurston's claim for punitive damages because the jury's finding was supported by substantial evidence.**

SBS challenges the district court's ruling that sufficient evidence existed to support an award of punitive damages for breach of contract. Simply put, SBS argues that the breach of contract here did not rise to the level of "crime or intentional tort" as required by this Court to warrant an award of punitive damages. Alternatively, SBS argues this Court should modify Idaho law to prohibit punitive damages from being awarded when a commercial contract has been breached.

19

A party seeking to recover for punitive damages must prove by clear and convincing evidence oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted. I.C. § 6-1604. In addition to oppressive behavior in a business context, the Idaho Court of Appeals has articulated five factors that courts consider in deciding whether there is substantial evidence of an extreme deviation from standards of reasonable conduct:

> (1) the presence of expert testimony; (2) whether the unreasonable conduct actually caused harm to the plaintiff; (3) whether there is a special relationship between the parties, as in the *Garnett* insured-insurer relationship; (4) proof of a continuing course of oppressive conduct; and (5) proof of the actor's knowledge of the likely consequences of the conduct.

*Cuddy Mountain Concrete Inc. v. Citadel Const., Inc.*, 121 Idaho 220, 229–30, 824 P.2d 151, 160–61 (Ct. App. 1992).

It is well established that punitive damages are unavailable in routine, ordinary breach of contract cases, however, this "should not be construed as a blanket prohibition against punitive damages in breach of contract claims." *Myers v. Workmen's Auto Ins. Co.*, 140 Idaho 495, 503, 95 P.3d 977, 985 (2004). "[N]umerous situations arise where the breaking of a promise may be an extreme deviation from standards of reasonable conduct, and, when done with knowledge of its likely effects, may be grounds for an award of punitive damages." *Id.* (quoting *Linscott v. Rainier Nat'l Life Ins. Co.*, 100 Idaho 854, 860, 606 P.2d 958, 964 (1980)).

"The assessment of punitive damages, like the assessment of all damages, is in the first instance for the discretion of the jury." *Boise Dodge, Inc. v. Clark*, 92 Idaho 902, 908, 453 P.2d 551, 557 (1969).

> [T]hose who deliberately and cooly engage in a far-flung fraudulent scheme, systematically conducted for profit, are very much more likely to pause and consider the consequences if they have to pay more than the actual loss suffered by an individual plaintiff. An occasional award of compensatory damages against such parties would have little deterrent effect. A judgment simply for compensatory damages would require the offender to do no more than return the money which he had taken from the plaintiff. In the calculation of his expected profits, the wrongdoer is likely to allow for a certain amount of money which will have to be returned to those victims who object too vigorously, and he will be perfectly content to bear the additional cost of litigation as the price for continuing his illicit business. It stands to reason that the chances of deterring him are materially increased by subjecting him to the payment of punitive damages.

*Id.* at 558, 453 P.2d at 909.

20

In permitting the jury to consider punitive damages, the district court well-recognized that under Idaho law a "party may breach a contract if it determines doing so is in its own economic interest, if it is prepared to accept responsibility for the breach. It may not—without exposing itself to punitive damages—avoid the consequences of the breach by means of concealment, oppression, intimidation, or despotism." On appeal, SBS maintains that punitive damages are not appropriate when the undisputed evidence shows that Thurston's own profits continually increased after the acquisitions. However, the district court held the following evidence supported the jury's conclusion that SBS sought to avoid the consequences of its breach of Thurston's contractual rights through concealment and deception:

> [SBS] had a contractual obligation under Thurston's distributorship agreement to pay commissions on certain sales of Safeguard products by other distributors to Thurston's protected accounts. . . . [SBS] knew from its due diligence that DocuSource and IBF shared a large number of customers with Thurston and that [SBS's] acquisition of the companies under the BAM program would lead infringing sales of Safeguard products to Thurston's protected accounts . . . Rather than honor Thurston's account protection rights through its typical practice of rotating commissions, [SBS] set an arbitrary account mitigation budget and sent Mr. Dunlap to "negotiate" with Thurston. [SBS] expected that Mr. Dunlap would "underspend" or compel Thurston to capitulate to giving up his protected accounts for an amount less than the set budget.
>
> When attempting to negotiate with Thurston, the jury heard that Mr. Dunlap, over a period of several months, consistently misrepresented and/or concealed the extent of account protection violations, despite receiving DocuSource and IBF's monthly reports showing infringing sales. . . . After Thurston refused to capitulate, [SBS] did not attempt to prevent DocuSource and IBF from making the infringing sales and did not rotate the commissions on such sales to Thurston as it was contractually obligated to do, thereby compelling him to file suit. . . . Mr. Taylor established that [SBS] failed to rotate to Thurston commissions totaling $231,169 (or $201,516 with a source fee deduction) on sales made by DocuSource and IBF.

Punitive damages are reserved for cases that involve "oppressive, fraudulent, malicious or outrageous conduct." SBS's active concealment of IBF and DocuSource sales to Thurston's protected customers supported the jury's award of punitive damages. The point of punitive damages is to deter such conduct. *Davis v. Gage*, 106 Idaho 735, 739, 682 P.2d 1282, 1286 (Ct. App. 1984) ("an assessment of punitive damages takes away the incentive for engaging in bad conduct by making such conduct unprofitable."). Here, SBS's president, Mr. Sorrenti, testified that he did not consider $4 million in revenue associated with account protection conflicts to be a

21

large number of shared customers; thus, it appears that punitive damages were not only appropriate, but necessary for SBS to appreciate the damage caused by its breach of the Agreement.

Alternatively, SBS requests this Court modify Idaho law to prohibit punitive damages in cases involving the breach of a commercial contract. This Court has already directly held that "[i]t is not the nature of the case, *whether tort or contract*, that controls the issue of punitive damages." *Myers v. Workmen's Auto Ins. Co.*, 140 Idaho 495, 503, 95 P.3d 977, 985 (2004) (emphasis added). In 2003, Idaho Code section 6-1604 was amended to require "[i]n *any action* seeking recovery of punitive damages, the claimant must prove, by clear and convincing evidence, oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted." (Emphasis added). The Legislature limited potential liability by capping punitive damages rather than limiting the type of claims that may warrant punitive damages. *See* I.C. § 6-1604(3) ("No judgment for punitive damages shall exceed the greater of two hundred fifty thousand dollars ($250,000) or an amount which is three (3) times the compensatory damages contained in such judgment.").

We decline to modify Idaho law as SBS invites. The standards set forth in the statute, as well as in this Court's cases, will continue to guide litigants and courts regarding the parameters for awarding punitive damages in Idaho. We hold that the district court appropriately sustained the jury's award of punitive damages based on the facts in this case.

**G.      The district court properly denied SBS's motion for post-judgment relief on Thurston's claim for future damages because the jury's finding was supported by substantial evidence.**

SBS separately challenges the jury's award of future damages arguing that Thurston's expert, Mr. Taylor, used a flawed metric that (1) compensated a 36-month right of account protection with 8+ years of future commissions; (2) failed to account for historical account attrition rates; and (3) ignored the at-will nature of the parties' relationship.

"Compensatory damages for lost profits and future earnings must be shown with a reasonable certainty." *Inland Grp. of Companies, Inc. v. Providence Washington Ins. Co.*, 133 Idaho 249, 257, 985 P.2d 674, 682 (1999) (citing *Hummer v. Evans*, 129 Idaho 274, 280, 923 P.2d 981, 987 (1996)). Thus, damage awards based on speculation and conjecture will not be allowed. *Id*. (citing *Rindlisbaker v. Wilson*, 95 Idaho 752, 519 P.2d 421 (1974)).

22

"[E]vidence is sufficient if it proves the damages with reasonable certainty. 'Reasonable certainty requires neither absolute assurance nor mathematical exactitude; rather, the evidence need only be sufficient to remove the existence of damages from the realm of speculation.' " *Griffith v. Clear Lakes Trout Co., Inc.*, 146 Idaho 613, 618, 200 P.3d 1162, 1167 (2009) (citation omitted). "The measure of damages for loss of profits is 'rarely susceptible of accurate proof. . . .' Therefore, the law does not require 'accurate proof with any degree of mathematical certainty. . . . ' " *Trilogy* [*Network Sys., Inc. v. Johnson,* 144 Idaho 844, 846, 172 P.3d 1119, 1121 (2007)](citations omitted). "Any claim of damages for prospective loss contains an element of uncertainty, but that fact is not fatal to recovery. 'The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.' " *Smith v. Mitton*, 140 Idaho 893, 900, 104 P.3d 367, 374 (2004) (citations omitted).

*Saint Alphonsus Diversified Care, Inc. v. MRI Assocs., LLP*, 157 Idaho 106, 116, 334 P.3d 780, 790 (2014).

At trial, Mr. Taylor determined the present value of Thurston's future account protection damages by applying a one times annual revenue metric based on IBF and DocuSource's sales to Thurston's protected accounts in 2015. Using this metric, Mr. Taylor calculated $241,869 for future IBF sales and $73,719 for DocuSource sales. SBS characterizes Mr. Taylor's testimony as awarding eight years of future damages when the Agreement only purports to guarantee three. SBS emphasizes the following testimony given by Mr. Taylor during cross-examination:

Q: How far out are you valuing the commission rights for the metric one times annual sales that you were using? . . .

A: . . . I think about eight years, I think you get most of the way there.

Q: Eight years, not 8 to 12 or beyond?

A: I just put eight for the period. You get $356,725, which is pretty [sic] most of the way there to that $373,000 number. So it's about eight years to pretty much get there.

Q. Your calculation would pay T3 and Thurston right now for eight years of future commissions, is that right?

A. That's the math of it. . . .

However, SBS's interpretation is misleading. Mr. Taylor testified that the applicable metric was the equivalent of three times IBF and DocuSource's gross profits for 2015, and that one times annual revenues equates to approximately three years of commissions. Thus, Thurston would be compensated for IBF and DocuSource's commissions for three years into the future,

23

which is consistent with the Agreement. It is also worth noting that SBS failed to provide any evidence to counter or contradict Mr. Taylor's conclusions at trial.

Next, SBS asserts that Mr. Taylor disregarded historical attrition rates of 35% for IBF customers and 26% for Thurston's customers. Mr. Taylor testified that several risk factors, including customer attrition, were factored into the one times revenue metric ("[SBS] is the one who buys a lot of these, they establish what these values are, and they know what the attrition factor is, and all I'm doing is using the metric that [SBS] is using."). The district court found that Mr. Taylor's estimation of future damages was supported by a reliable metric based on sound assumptions and his calculations were supported by the evidence.

Last, SBS argues that future damages are not appropriate because the Agreement could have been terminated. However, the Agreement only allowed for termination if certain conditions were met and SBS presented no evidence those conditions existed at trial. The district court acknowledged this and held there was no evidentiary basis for SBS to rely on a termination to limit Thurston's future damages. We hold that substantial evidence supported the jury's verdict as it pertained to future damages and the district court properly denied SBS's motion for post-judgment relief.

## H.     Thurston is awarded attorney fees on appeal.

SBS and Thurston both request attorney fees on appeal under Idaho Code section 12-120(3). Thurston also requests attorney fees under Idaho Code section 12-121. SBS also argues that we modify the amount of attorney fees awarded Thurston due its claimed errors by the trial court.

> When a party prevails at both trial and on appeal, and that party received an award of attorney fees under Idaho Code section 12-120(3) at the trial level and the award is affirmed on appeal, that party is also entitled to an award of attorney fees for the appeal pursuant to Idaho Code section 12-120(3).

*Idaho Transp. Dep't v. Ascorp, Inc.*, 159 Idaho 138, 142, 357 P.3d 863, 867 (2015). As the prevailing party, Thurston is entitled to attorney fees under Idaho Code section 12-120(3). Because Thurston is the prevailing party on appeal we will not consider SBS's request to modify the district court's award of attorney fees.

## V. CONCLUSION

The district court's judgment is affirmed. Costs and attorney fees awarded to Thurston.

Chief Justice BURDICK, Justices BRODY, STEGNER and HORTON, CONCUR.