# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 46056

CALDWELL LAND AND CATTLE, LLC,
an Idaho limited liability company, aka
CALDWELL LAND & CATTLE
COMPANY, LLC,

    Plaintiff-Respondent,

v.

JOHNSON THERMAL SYSTEMS, INC.,
an Idaho corporation,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, May 2019 Term

Opinion Filed: November 15, 2019

Karel A. Lehrman, Clerk

---

Appeal from the District Court of the Third Judicial District, State of Idaho, Canyon County. Christopher S. Nye, District Judge.

District court's amended final judgment <u>vacated</u> and <u>remanded.</u>

Hawley, Troxell, Ennis & Hawley, LLP, Boise, for appellant. Lynnette Michele Davis argued.

Strong & Hanni, Salt Lake City, Utah, for respondent. William Ingram argued.

---

BURDICK, Chief Justice.

This appeal stems from an unlawful-detainer and breach-of-contract action filed by Caldwell Land and Cattle, LLC, ("CLC") after purchasing a building where the holdover tenant, Johnson Thermal Systems ("JTS"), asserted a right to remain on the property. The dispute centers on the interpretation of a lease between JTS and the original property owner which granted JTS an option to extend the lease. JTS contends it properly exercised the option; CLC contends JTS did not. The district court held that JTS failed to exercise the option and thus became a holdover tenant. The court further held that when JTS did not vacate within the proper timeframe, JTS unlawfully detained the premises and was liable for the ensuing damages. JTS timely appeals.

1

# I. FACTUAL AND PROCEDURAL BACKGROUND

In February 2012, JTS, a producer of industrial refrigeration equipment, entered into a lease agreement (the "Lease") with the Gilbert Family Trust ("Gilbert") for a commercial property located in Caldwell, Idaho. The Lease granted JTS an option to renew for two one-year terms but required JTS to give Gilbert at least 60 days' prior written notice of its intent to do so before the Lease's expiration. In addition, all amendments, modifications, or changes to the Lease were to be made in writing and signed by the parties. In March 2013, JTS and Gilbert[1] signed a written amendment to the Lease which expressly stated that JTS was exercising its option to extend the Lease for one of its additional one-year terms. The amendment extended the Lease until April 15, 2014.

During 2014, JTS began constructing a new facility at a different location. In the meantime, JTS and Gilbert's agent discussed plans for renewing the Lease beyond its expiration on April 15, 2014. Gilbert was aware that JTS planned to move its operation once the new facility was completed, and JTS knew Gilbert was hoping to sell the property. During negotiations, Gilbert presented possibilities of month-to-month, 6-month, and one-year terms at different rates. On April 10, 2014 JTS told Gilbert via email that it "would like to do a 6 month lease with the option to go month to month for an additional 3–6 months."

JTS and Gilbert drafted and signed an amendment extending the Lease until October 15, 2014 (the "Extension Amendment"). The Extension Amendment set rent for the 6-month term at $6,000 per month. If JTS wished to extend the Lease at the conclusion of the 6-month term, the Extension Amendment provided two possible arrangements: JTS could extend the Lease either for an additional 6-month term at $6,000 per month, or on a month-to-month basis at $6,250 per month. All other terms and conditions remained "in full force and effect" unless "specifically amended."

During this 6-month extension term, JTS and Gilbert's agent discussed extending the lease beyond October 15th. However, JTS never definitively answered whether it would elect to extend the Lease or which arrangement it would select if it did choose to extend. JTS consistently gave Gilbert possible vacation dates that were considerable time before April 15, 2015 (the would-be termination date if the second 6-month extension were selected). For

---

[1] The Gilbert Family Trust is operated by Arlene Gilbert. Gilbert accepted the rent payments directly, but most of the lease negotiations and correspondence were handled through her agents.

example, JTS informed Gilbert in August 2014 that it was "hoping on the December move in on the new building, but it could be January." A month later, Gilbert's agent asked JTS to keep him informed of their planned vacancy of the building. The agent advised JTS that he had told Gilbert that JTS was "shooting for December 15th." He also informed JTS that Gilbert would be signing a listing agreement and installing a "For Sale" sign on the property in the coming week.

October 15, 2014 passed without a written or oral agreement extending the lease. JTS continued to occupy the building and paid $6,000 in rent for November and December 2014. In November 2014, Gilbert entered into an agreement to sell the property to CLC. CLC is a single-purpose LLC created to own and manage the property. Its sole purpose was to lease the property to Caldwell Peterbilt. In the first week of December, Gilbert's agent informed JTS that Gilbert was selling the property and that she and CLC aimed to close by December 31, 2014. JTS was also informed that CLC would issue a 30-day eviction notice. JTS then asserted that it had exercised the 6-month extension. Less than a week later, Gilbert sent JTS a written "Notice of Termination" which required JTS to surrender possession on January 31, 2015, at which point the lease would terminate. The termination notice also required JTS to leave the property in the same condition it was in upon entering the Lease including the removal all trade fixtures.

Gilbert and CLC closed on the property in late December 2014. After this, CLC and JTS had discussions centering on when JTS could be out by the earliest. The parties were unable to reach an agreement. On January 22, 2015, CLC filed a complaint for unlawful detainer based upon JTS's representation that it would not surrender the property on January 31. The complaint sought possession of the property. A week later, on January 29, JTS reiterated its position that it had exercised the 6-month extension and stated that it did not plan to vacate the premises until April 15, 2015.

However, JTS vacated the property around February 12, 2015, after the City of Caldwell approved an early move into its new facilities. JTS made no repairs to the property and left in place a leased 480V electrical transformer which JTS had installed a year earlier. On February 23, 2015, JTS contacted Idaho Power to request that they remove the transformer. After Idaho Power removed the transformer, Peterbilt called Idaho Power to reinstall the transformer on March 2. Peterbilt would take possession of the property in May 2015.

CLC amended its complaint on March 24, 2015. The complaint no longer sought possession of the property, but sought damages associated with JTS's alleged unlawful detainer.

3

In addition, the amended complaint alleged breach of contract; breach of the implied covenant of good faith and fair dealing; and intentional and malicious injury to property. JTS counterclaimed for breach of contract; constructive eviction; and for a refund of the security deposit and the unearned portion of the February 2015 rent.

More than two years later, in August 2017, the district court held a three-day bench trial. In the written decision which followed, the district court ruled that the plain language of the Lease required all amendments, modifications, or changes to be in writing and signed by the parties. Determining that the Extension Amendment did not alter or eliminate the writing requirement, the court ruled that the Extension Amendment's 6-month extension needed to be put in writing. Since the parties failed to create a written extension, the district court ruled that JTS and Gilbert created a "month-to-month" or "at-will" tenancy when JTS paid, and Gilbert accepted, $6,000 in rent after the extension deadline passed. For the unlawful-detainer claim, the court found JTS liable for failing to vacate by the Notice of Termination's January 31, 2015 deadline. For the breach-of-contract claim, the court found JTS liable for failing to vacate after its term expired, removing the transformer without CLC's permission, and failing to make repairs. The district court also found that JTS breached the implied covenant of good faith and fair dealing by failing to give timely notice to CLC of when it would vacate the property and by failing to pay the higher rent for the month-to-month option. Finding that JTS agreed to indemnify CLC in the Lease, the court ruled that CLC was entitled to $86,389.26 in damages for unpaid rent, damages and costs caused by removal of the transformer, costs to repair the property, and damages related to Peterbilt's inability to move into the building on February 1st (such as rent due on extending Peterbilt's prior lease, costs of an idle employee, and lost profits).

After the district court's findings of facts and conclusions of law were entered, CLC requested attorney's fees under Idaho Code section 6-324, Idaho Rule of Civil Procedure 54(e)(1), and the Lease. Meanwhile, JTS moved to reconsider, alter, or vacate the judgment. The court summarily denied JTS's motion. The district court awarded CLC $150,000 in attorney's fees under the Lease and Idaho Code section 6-324 in addition to around $3,400 in costs as a matter of right. The district court then entered a final judgment awarding damages, costs, and attorney's fees. JTS timely appeals.

## II. ISSUES ON APPEAL

1. Did the district court err in concluding that the JTS did not intend to exercise the 6-month option to extend the Lease?

2. Did the district court err by hearing CLC's contract claims in a proceeding that began as an unlawful detainer claim for damages?

3. Did the district court err in awarding damages to CLC based on unlawful detainer or breach of contract?

4. Did the district court properly award attorney's fees to CLC below?

5. Is either party is entitled to attorney's fees on appeal?

## III. STANDARD OF REVIEW

"Review of a trial court's conclusions following a bench trial is limited to ascertaining whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law." *Borah v. McCandless*, 147 Idaho 73, 77, 205 P.3d 1209, 1213 (2009) (citing *Benninger v. Derifield*, 142 Idaho 486, 488–89, 129 P.3d 1235, 1237–38 (2006)). "This Court will not set aside a trial court's findings of fact unless the findings are clearly erroneous." *Id.* "Clear error will not be deemed to exist if the findings are supported by substantial and competent, though conflicting, evidence." *Mortensen v. Berian*, 163 Idaho 47, 50, 408 P.3d 45, 48 (2017) (quoting *Pandrea v. Barrett*, 160 Idaho 165, 171, 369 P.3d 943, 949 (2016)). Substantial and competent evidence exists "[i]f there is evidence in the record that a reasonable trier of fact could accept and rely upon in making the factual finding challenged on appeal . . . ." *Id.*

However, this Court "exercises free review over matters of law and is not 'bound by the legal conclusions of the trial court, but may draw its own conclusions from the facts presented.'" *Morgan v. New Sweden Irr. Dist.*, 160 Idaho 47, 51, 368 P.3d 990, 994 (2016) (quoting *Credit Suisse AG v. Teufel Nursery, Inc.*, 156 Idaho 189, 194, 321 P.3d 739, 744 (2014)). But this Court "will not substitute [its] view of the facts for the view of the district court," so "the trial court's findings of fact will be liberally construed in favor of the judgment entered." *Mortensen,* 163 Idaho at 50, 408 P.3d at 48 (citations omitted).

"The awarding of attorney fees and costs is within the discretion of the trial court and subject to review for an abuse of discretion." *In re Estate of Birch*, 164 Idaho 631, 633,434 P.3d 806, 808 (2019) (quoting *Smith v. Mitton*, 140 Idaho 893, 897, 104 P.3d 367, 371 (2004)). Thus, this Court conducts a four-part inquiry to determine whether the trial court: "(1) correctly

perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018) (citing *Hull v. Giesler*, 163 Idaho 247, 250, 409 P.3d 827, 830 (2018)).

## IV.    ANALYSIS

In light of the many issues and arguments raised in this appeal, we first address (A) whether the district court erred in determining that JTS failed to exercise the 6-month extension option. Next, we discuss (B) whether the district court erred by considering contract claims in a proceedings that began as an unlawful detainer action for possession. Finding no error, we then assess whether its award of damages under either unlawful detainer or breach of contract must be revised. Concluding that the damages must be revised, we provide (C) a calculation of the damages awardable in this case. Next, we take up (D) whether the district court abused its discretion in awarding attorney's fees below. Lastly, we address (E) whether either party is entitled to attorney's fees on appeal.

### A. JTS became a month-to-month tenant after holding over because it did not intend to exercise the 6-month option to extend.

The district court determined that JTS failed to exercise the Extension Amendment's 6-month extension option because the Lease required all amendments, modifications, or changes to be in writing and signed by the parties. Importantly, the district court also found that JTS was "clear" about its intent to move out as soon as the new facility was completed and that JTS did not intend to exercise the 6-month extension. In fact, the district court found that "[u]ntil the present dispute arose, neither [JTS] nor Gilbert intended to renew the lease for a [6]-month term after October 15, 2014."

On appeal, JTS claims that the Extension Amendment itself was a modification which changed how it and Gilbert could extend the Lease going forward. Thus, in JTS's view, all that was required under the Extension Amendment to trigger the 6-month extension was to pay the rent at the 6-month rate and continue in possession. In support, JTS relies on the Court of Appeals' decision in *Dante v. Golas* to argue that, because the Extension Amendment lacks the "written notice" language, it does not require a writing to be effective. (citing 121 Idaho 149, 823 P.2d 183 (Ct. App. 1992). While JTS's arguments have a legal foundation, the district court's finding that JTS did not intend to exercise the lease extension is dispositive of this issue. As

6

explained below, (1) JTS failed to exercise the 6-month extension, and, as a result, (2) JTS and Gilbert entered into an implied-at-law periodic tenancy after the extension was not exercised.

    1. <u>JTS did not exercise the 6-month extension because it lacked the intent to exercise the option.</u>

"The purpose of interpreting a contract is to determine the intent of the contracting parties at the time the contract was formed." *Thurston Enterprises, Inc. v. Safeguard Bus. Sys., Inc.*, 164 Idaho 709, 717, 435 P.3d 489, 497 (2019) (citation omitted). To accomplish this, "the contract is to be viewed as a whole." *Id.* "The interpretation of a contract begins with the language of the contract itself." *Cristo Viene Pentecostal Church v. Paz*, 144 Idaho 304, 308, 160 P.3d 743, 747 (2007) (quoting *Independence Lead Mines Co. v. Hecla Mining Co.*, 143 Idaho 22, 26, 137 P.3d 409, 413 (2006)). "An unambiguous contract will be given its plain meaning." *Bakker v. Thunder Spring-Wareham, LLC*, 141 Idaho 185, 190, 108 P.3d 332, 337 (2005). "A contract is ambiguous if it is reasonably subject to conflicting interpretations." *Id.* "Determining whether a contract is ambiguous is a question of law over which this Court exercises free review." *Cristo Viene*, 144 Idaho at 308, 160 P.3d at 747. However, "interpreting an ambiguous term is an issue of fact." *Thurston Enterprises, Inc.*, 164 Idaho at 717, 435 P.3d at 497 (quoting *Phillips v. Gomez*, 162 Idaho 803, 807, 405 P.3d 588, 592 (2017)).

For contractual options, precision in language is paramount. This fact is evidenced in *Dante v. Golas*. 121 Idaho 149, 823 P.2d 183 (Ct. App. 1992). There, the Court of Appeals examined a lease agreement where the tenants had the option to assume the mortgage on the property. *Id.* at 150, 823 P.2d at 184. At issue was the following lease provision:

> NOTICE—If lessees wish to assume mortgage prior to 12/31/88, they agree to give owners at least 30 days notice prior to the date they wish to assume. This will enable owners to obtain and complete the proper papers.
>
> > 1. At the end of this lease, the lessees have the option of assuming the mortgage at the prevailing rate and terms.

*Id.* The tenant in *Dante* provided notice in mid-December that they wished to purchase the property, but the landlord refused to sell. *Id.* The district court concluded the tenant had complied with the unambiguous terms of the lease by sending a letter of intent to assume the mortgage upon expiration of the lease in mid-December. *Id.* On appeal, the landlord argued that the tenant failed to exercise the option in a timely fashion because it was required to actually assume the mortgage prior to the expiration of the lease term. *Id.* The Court of Appeals disagreed, stating:

7

The above-quoted language of the lease-option does not provide that an option to be exercised "at the end of [the] lease" was subject to the thirty-day notice requirement; this requirement was expressly limited to an assumption of the mortgage "prior to" December 31, 1988. As to the argument that the assumption had to have been actually completed by December 31, 1988, the lease-option contained no stated condition precedent that performance, rather than notice of intent to perform, had to take place during the option period.

*Id.*

Here, the relevant provisions of the Lease gave JTS the option to renew the Lease so long as it gave prior written notice:

> **TERM OF LEASE:** Lessee shall be entitled to exclusive possession of the premises for a period of thirteen (13) months commencing on March 15, 2012 and terminating on April 15, 2013. The base rent for the first month of the initial term (3/15/1012–4/15/2012) shall be waived. At least (60) sixty days prior to the expiration of the lease term, the Lessee shall give the Lessor written notice of his intention to renew the lease . . .

> **OPTION TO RENEW:** Upon Lessor's receipt of written notice by the Lessee at least sixty (60) days prior to the expiration of this Lease Agreement, Lessor grants to Lessee an option to renew this Lease for an additional two (2) terms of one (1) year each commencing with the expiration for this Lease Agreement. Rent shall increase on the basis of three percent (3%) with the commencement of each new term. All other terms of the renewed lease shall be negotiable . . .

> **MODIFICATION:** This agreement may not be amended, modified or changed except by a writing signed by all parties hereto . . .

The Extension Amendment, on the other hand, extended the lease term and granted JTS an option to further extend the lease term:

> 1. Extension of Term. The Lease Term of the Lease is hereby extended Six (6) months, effective as of April 16, 2014. The Lease Term, as extended by this Amendment, shall expire upon October 15, 2014 . . .

> 3. At the conclusion of this lease extension the Tenant shall have the option to extend the lease agreement for an additional period of either six (6) months or on a month to month basis at the following rates:

> > a. Six Month Term: Base Rent = $6,000/mo

> > b. Month to Month Term: Base Rent = $6,250.00/mo . . . .

> 4. All other terms and conditions of the Lease Agreement, not specifically amended hereby, remain in full force and effect.

Viewing the contract in its entirety, the district court's reliance on the modification provision is misplaced. The modification provision merely provides that all changes must be in writing as opposed to an oral agreement. The Extension Amendment is a valid exercise of the

modification provision. As a freestanding amendment, its terms govern how the option to extend must be exercised. Previously, the parties signed amendment to the Lease to renew the Lease, but these amendments also changed the terms of the Lease. Here, no new writing would have been required if JTS exercised the options to extend under the Extension Amendment because all possible terms, including price and duration, appeared in the Extension Agreement itself.

We must next determine whether the Extension Amendment contains a notice requirement. While the Lease required JTS to give 60 days' written notice of intent to exercise the option to renew, the Extension Amendment lacked such a requirement. The option to extend is both semantically and substantively distinct from the option to renew. A renewal, by its nature, is a new lease, with new terms, and thus, must be signed anew. An extension, on the other hand, prolongs the current lease term rather than creating a new one. Thus, to comply with the extension's terms, JTS was contractually required to pay rent and continue in possession. While JTS can be fairly said to have done that, this does not end the inquiry.

Where, as here, a lease's option to extend lacks a notice provision, the prevailing rule is that the court will presume that a tenant has validly exercised the option when the tenant holds over and pays the agreed-upon rent. *See Ellis v. Pauline S. Sprouse Residuary Tr.*, 280 S.W.3d 806, 811 (Tenn. 2009) (listing cases). However, excepted from this general rule are circumstances where the parties' intent or conduct rebuts that presumption. *See* 52 C.J.S. Landlord & Tenant § 112 ("[I]n determining whether a holding over has effected an extension or renewal under an option therefor, the holding over should be considered in connection with the intention of the parties and the circumstances attending the transaction.").

This case presents the exception to the general rule. Any presumption that JTS exercised the 6-month option to extend is foreclosed by the district court's factual finding that JTS did not intend to exercise the option. After the three-day trial, the district court found that neither JTS nor Gilbert intended to exercise the 6-month option. This finding is supported by substantial, competent evidence. The district court rested this finding upon the written correspondence between JTS and Gilbert detailing the touch-and-go nature of JTS's new building, noting that JTS "made clear" it intended to move out as soon as it could move into its new facility. The district court also noted that all of JTS's proposed exit dates would have occurred prior to the end of the second 6-month option to extend. Given these findings, the district court did not err in determining that JTS failed to exercise the 6-month extension.

9

2. <u>JTS and Gilbert entered into an implied-at-law periodic tenancy because JTS paid, and Gilbert accepted, monthly rent in the absence of a formal agreement.</u>

The next inquiry concerns the nature of the leasehold created after JTS failed to exercise the 6-month option. The district court ruled that JTS "carried on as a month-to-month or at-will tenant." While this ruling is not altogether incorrect, the phrasing is imprecise. Considering the entirety of the district court's decision, it appears that the district court meant to construe the leasehold as a month-to-month periodic tenancy. For the reasons below, we agree.

A holdover tenancy is "a tenancy arising when a person who has been in lawful possession of a property wrongfully remains as a holdover after his or her interest has expired." Black's Law Dictionary 1694 (10th ed. 2014). While "holding over" describes the tenant's action, the tenancy created when a tenant holds over depends on how the landlord treats the tenant's holdover. The landlord can either (1) treat the holdover tenant as a trespasser or (2) hold the tenant to a new tenancy. *See Lewiston Pre-Mix Concrete, Inc. v. Rohde*, 110 Idaho 640, 644–45, 718 P.2d 551, 555–56 (Ct. App. 1985). Upon treating the tenant as a trespasser, the landlord may bring an action for unlawful detainer. *Id.* at 556, 718 P.2d at 556. But if lessor "seeks, implicitly or explicitly, to hold lessee to new tenancy," then "a new lease arises by operation of law." *Id.* Such operation-of-law tenancies may take different forms—such as at will or periodic. *See id.* A tenancy at will has no fixed terms while a periodic tenancy automatically continues for successive periods. *Id.*

Here, a month-to-month periodic tenancy arose when JTS remained on the property and Gilbert accepted rent on a monthly basis. Just as the parties' conduct and intent informs whether JTS exercised the option to extend, it also informs the tenancy that is created. *See* 52 C.J.S. Landlord & Tenant § 248. Gilbert's acceptance of rent on a monthly basis evidences the intent to hold JTS to a new tenancy and supplies the periodic intervals that define the tenancy. *See id.* ("In the absence of an express agreement thereon, a tenancy from month to month arises from a tenant's holding over where the rent under the prior lease was on a monthly basis, even though the expired term was for a period of years, or where the rent during the holdover tenancy is on a monthly basis."). This month-to-month tenancy was governed by the terms of the original Lease. *Id.* at § 250; *Lewiston Pre-Mix Concrete, Inc.*, 110 Idaho at 645, 718 P.2d at 556.

The periodic tenancy lasted until it was terminated on January 31, 2015, as outlined in the written termination notice CLC delivered. Since JTS held over past this deadline, we again look to the landlord's action to determine the tenancy created. This time, CLC (the landlord at this

10

juncture) treated JTS as a trespasser and filed an unlawful-detainer action seeking possession of the property. This being so, JTS unlawfully detained the premises beginning on February 1, 2015. Despite this change of treatment, JTS remained under the same responsibilities outlined in the Lease. *See* Restatement (Second) of Property, Landlord & Tenant § 14.7 (1977) ("The responsibilities of the tenant who improperly holds over will in every case remain as great as they were under the original lease.").

**B. The district court did not err by considering contract claims in an unlawful detainer action for damages for unlawful detainer and breach of contract, however, its award of damages under those theories must be revised.**

On appeal, JTS makes a number of arguments concerning the district court's award of damages. Before addressing the arguments, it's helpful to outline how the district court ruled and awarded damages in this case. In its written decision, the district court ruled that JTS unlawfully detained the property beginning on February 1, 2015, because "it failed to vacate the premises within the timeframe set forth in the notice to vacate" and was, therefore, liable for damages which "are the proximate or direct result of the unlawful detention." The district court also ruled that JTS breached the contract because it "failed to vacate the Property after the term expired; removed the transformer after the term expired and without [CLC's] permission; and failed to make repairs." Lastly, the district court ruled that JTS breached the implied covenant of good faith and fair dealing "when it failed to give timely notice of when it would vacate the property, and failed to pay the higher rent amount for the month-to-month option."

Damages were awarded to CLC based on these broad findings of liability, without specifying whether a category of damages fell under which theory. To illustrate, the district court award CLC damages based "on [JTS's] unlawful detainer and breach of contract, the terms of the Lease Agreement, and the applicable law . . . ." With this statement, the district court also included a footnote stating that "[b]reach of the implied covenant of good faith and fair dealing is a breach of contract theory." Without specifying which categories of damages were awarded under which theory, the district court entered the following amounts with the following explanations:

- $ 7,603.12 | Rent due under the Lease through April 15, 2015;
- $ 7,929.00 | Damages and costs caused by JTS's removal of the transformer;
- $ 2,600.00 | Costs to repair the property;
- $14,587.92 | Peterbilt's rent and triple-net expenses for its prior lease;

11

- $ 7,696.22 | Cost of Peterbilt's idle employee;
- $45,973.00 | Peterbilt's lost profits.

Given the district court's lack of specificity[2], the parties are left to argue which damages should have been awarded under which theory. In assessing these awards, we are mindful that the "findings of the trial court on the question of damages will not be set aside when based upon substantial and competent evidence." *Weitz v. Green*, 148 Idaho 851, 857, 230 P.3d 743, 749 (2010).

With this in mind, we turn to the district court's award of damages. First, we address (1) JTS's argument that the district court lacked jurisdiction to award the breach-of-contract damages in an unlawful detainer proceeding. Concluding that the district court properly considered CLC's contract claims, we then address (2) whether the district court erred in awarding unlawful-detainer damages based on CLC's resulting liability to Peterbilt. We then assess (3) the district court's findings and award of damages based on CLC's breach of contract theories.

1. The district court did not err by hearing CLC's contract claims in an action that was initially filed as an unlawful-detainer action for possession.

JTS argues that the district court lacked jurisdiction to award damages under CLC's contract claims because CLC elected to proceed under Idaho's unlawful-detainer statutes. JTS asserts that the contract claims exceeded the proper scope of the proceeding, which, JTS argues, has been narrowed by this Court to focus solely on the issue of possession.

We should first note that this argument was not raised below. However, since JTS characterizes it as a question of "subject-matter jurisdiction," we address it, despite ultimately finding the characterization inapt. *See Dunlap v. State*, 146 Idaho 197, 199, 192 P.3d 1021, 1023 (2008) ("Whether a court lacks jurisdiction to hear a case is a question of law, and may be raised at any time.") (citing *Pizzuto v. State*, 127 Idaho 469, 471, 903 P.2d 58, 60 (1995)). We conclude that the district court could properly consider the contract claims alongside CLC's amended

---

[2] The district court's treatment of damages in this manner is understandable in light of the CLC's pleadings and closing arguments, which grouped the two damage theories (unlawful detainer and breach of contract) together. This is despite arguing on appeal that substantive differences exist between the doctrines as to allowable rewards and requirements of proof. E.g. Respondent's Brief ("Significantly, however, as distinguished from consequential damages for a breach of contract, a reasonable understanding of the parties at the time of contract is not required to show special damages for unlawful detainer."). While exacting precision is not required in pleading or closing argument, an argument which claims that wholly distinct categories of damages can be awarded under separate legal theories should delineate the grounds of each. This is especially true when the special damages under unlawful detainer and the consequential damages under contract theories must be specifically pleaded and proved.

complaint for unlawful-detainer damages. Although the proceedings began as an unlawful-detainer action for possession, the parties resolved the issue of possession while the action was pending and CLC amended its complaint to seek only damages. Thus, the otherwise narrow scope of permissible issues could be properly expanded.

In general, unlawful-detainer actions are statutory, limited-purpose possessory actions which aid a landlord in reclaiming possession of property once a tenant no longer has a right to possession. Idaho's unlawful detainer statues have been codified since 1881 and appeared in Idaho's first publicly available compilation of Idaho laws. *See* R.S. 1887 § 5093. Some provisions, including the definition and judgment provision at issue in this case, remain largely unaltered. Then and now, one of the ways a tenant can unlawfully detain a property is by continuing in possession of a property without the landlord's permission after the expiration of the lease term. *Compare* I.C. § 6-303(1) *with* R.S. 1887 § 5093. Originally appearing under the title "Summary Proceedings for Obtaining Possession of Real Property," this Court, around the turn of the 19th century, held that the statute's scheme demonstrated the Legislature's intent to provide a "summary method" by which a landlord may recover defaulted rent and possession of the property.[3] *See Hunter v. Porter*, 10 Idaho 72, 81, 77 P. 434, 437 (1904). Given the limited scope, this Court repeatedly emphasized that the sole issue to be determined in the summary procedure was whether a landlord-tenant relationship existed, and, if so, which party had right to possession. *Carter v. Zollinger*, 146 Idaho 842, 844, 203 P.3d 1241, 1243 (2009) (citing *Coe v. Bennett,* 39 Idaho 176, 183–84, 226 P. 736, 738 (1924)).

To preserve the summary nature of the proceedings, this Court refused to allow the tenant to assert any defenses, counterclaims, or cross-claims which addressed issues other than right to possession. *Hunter*, 10 Idaho at 81, 77 P. at 437 (1904); *see also Texaco, Inc. v. Johnson*, 96 Idaho 935, 938, 539 P.2d 288, 291 (1975) ("No other extraneous issues are to be injected by either party to cloud the proceedings for to allow either party to interpose questions unrelated to the issue of possession would frustrate the purpose and objective of the unlawful detainer provisions."). This limitation prevents an unscrupulous tenant from introducing other issues simply to delay or frustrate a rightful claim to possession. *Hunter*, 10 Idaho at 81 77 P. at 437. In the past, this Court would vacate any ruling which strayed beyond matters of simple possession.

---

[3] The original iteration of the statute did not supply the parameters of the "summary proceedings." However, the statute has since been amended to provide the time limits for possessory actions in certain situations. *See* I.C. 6-310.

13

However, JTS's suggestion that these court-imposed limitations are jurisdictional is incorrect. True, this Court has quoted language from other jurisdictions which suggests that the unlawful-detainer proceedings are creatures of statute, and thus, a court's power to hear other issues is limited. *See Carter v. Zollinger*, 146 Idaho 842, 846, 203 P.3d 1241, 1245 (2009) ("[I]n an action for unlawful detainer the court is without jurisdiction to try any issue, except that involving the possession of real property, and therefore any judgment rendered by such a court in such an action cannot affect the title to said real property.") (quoting *Bekins v. Trull*, 69 Cal. App. 40, 230 P. 24, 25–26 (1924)). But there is a significant difference between subject-matter jurisdiction and a court-imposed limitation of issues. After all, in Idaho, the "district courts are courts of general jurisdiction." *Watkins v. Peacock*, 145 Idaho 704, 707, 184 P.3d 210, 213 (2008) (citing Idaho Const. Art. V, § 20). So when trial courts have decided issues outside the scope of right to possession, this Court has vacated those aspects of the decision, not for lack of subject-matter jurisdiction, but on the basis that such proceedings should be focused solely on possession. *See Richardson v. King*, 51 Idaho 762, 10 P.2d 323, 324 (1932) (striking portions of a judgment determining that the parties' transaction amounted to a mortgage); *Carter*, 146 Idaho at 846, 203 P.3d at 1245 (noting that findings in an unlawful detainer proceeding for possession which addressed matters of ownership were "without legal significance"). These decisions reflect the notion that it would be unwise to adjudicate substantial legal rights in a summary proceeding intended to determine right to possession. By the same token, broadening the proceedings would frustrate the purpose of an economical, summary proceeding by consuming more time and funds.

Here, there was no summary proceeding focused on possession. To be sure, the original complaint citing Idaho Code 6-303(1) was filed specifically to regain the premises and obtain damages under Idaho's unlawful detainer statutes. At the time of filing (January 22, 2015), JTS occupied the premises and stated its intent to remain in possession for three months past the termination notice's deadline to vacate. Yet, after JTS vacated the premises on February 12, 2015, CLC filed an amended complaint. The amended complaint no longer sought possession, but introduced CLC's contract claims and sought damages associated with the unlawful-detainer claim. According to the case summary in the record, the complaint was amended with JTS's stipulation and court approval. CLC no longer sought, and JTS no longer withheld, actual possession of the property. JTS had its new building. CLC had possession of the building it

purchased. The trial took place in August 2017, a full 31 months after the unlawful-detainer complaint was filed.

By resolving the issue of possession, and by amending the complaint, the parties removed the reasons for a summary proceeding, and with it, the need for the constraint on issues. This broadening of scope is not to the sole benefit of the landlord. The broadened scope also permits the tenant to present its defenses, counterclaims, and cross-claims—like JTS did here. This evolution of an unlawful-detainer proceeding is not atypical. *See, e.g.*, *Munden v. Hazelrigg*, 105 Wash. 2d 39, 45–46, 711 P.2d 295, 298 (1985) ("Where the right to possession ceases to be at issue at any time between the commencement of an unlawful detainer action and trial of that action, the proceeding may be converted into an ordinary civil suit for damages, and the parties may then properly assert any cross claims, counterclaims, and affirmative defenses."). In fact, the current iteration of the unlawful detainer statute expressly provides, in circumstances where a tenant fails to pay rent, that a landlord may seek damages, but, in doing so, the landlord relinquishes the right to have the issue of possession quickly adjudicated. *See* I.C. § 6-311E ("[T]he early trial provision of section 6-310, Idaho Code, shall not be applicable when an action for damages is combined with an action for possession.").

In sum, when a landlord instigates a proceeding solely for possession of a rental property, the only issue which may be adjudicated in the summary proceedings is the right to possession. However, if possession is resolved at any point before that proceeding concludes, then claims involving contractual damages can be introduced without "cloud[ing] the proceedings[.]" *Texaco, Inc.*, 96 Idaho at 938, 539 P.2d at 291. Had JTS remained on the property or CLC failed to amend the complaint, JTS's argument might have more merit. But on these facts, the district court did not err by hearing the contract claims alongside the claim for unlawful-detainer damages.

2. <u>JTS is liable to CLC for damages from their unlawful detainer of the property in the form of lost rent and lost profits, but any damages based on CLC's alleged liability to Peterbilt are unrecoverable.</u>

Having concluded that the district court did not err by enlarging the proceedings, we turn our attention to its award of damages for unlawful detainer. Relying on Idaho Code section 6-303(1) and this Court's decision in *Texaco, Inc. v. Johnson*, 96 Idaho 935, 938, 539 P.2d 288, 291 (1975), the district court determined that JTS unlawfully detained the property because it

15

failed to vacate the premises by the termination notice's deadline and was, therefore, liable for damages which "are the proximate or direct result of the unlawful detention."

JTS argues that only damages to CLC resulting from the 12-day unlawful detention fall within the "proximate or direct result" requirement, and even those damages should be vacated in the judgment since JTS paid rent through February 15. JTS argues that Peterbilt's damages are irrelevant because they are not a party to the suit and have no standing to assert their claim. In response, CLC points to this Court's decision in *Texaco* as evidence that special damages are appropriate and contends that Peterbilt's damages constitute CLC's "special damages" because of its lease with Peterbilt. CLC contends that there were two delays caused by the unlawful detainer: (1) the "first delay" which was caused by the unlawful detainer itself; and (2) the "second delay" caused by the removal of the transformer. CLC argues that it "demonstrated that it was liable to Peterbilt" under its lease with Peterbilt in its closing brief. For CLC, JTS unlawfully detained the property "at least through the removal of the Transformer and the end of that month."

Under Idaho Code section 6-316, a prevailing landlord is entitled to restoration of possession as well as "damages" and "rent found due." *Texaco*, 96 Idaho at 938, 539 P.2d at 291. In *Texaco*, this Court explained that the landlord carries the burden to prove that the "damages" are the "proximate or direct" result of the tenant's unlawful detainer of the property. *Id.* at 940, 539 P.2d at 293. There, a landlord gas company brought an unlawful-detainer action against the operator of one of its bulk plants who refused to vacate after the landlord terminated its lease. *Id.* at 936, 539 P.2d at 289. After the operator refused to vacate, the gas company began constructing a temporary facility on separate land and filed an unlawful-detainer action. *Id.* The district court in *Texaco* determined that the operator unlawfully detained the property and awarded the gas company the reasonable rental value of the property. However, the district court refused to award damages related to constructing the temporary facility because it determined that those damages were not the "natural and proximate" consequence of the unlawful detainer. *Id.* This Court affirmed the district court's denial, unpersuaded by the gas company's argument that it was "forced" to construct the plant or "be faced with the possibility of losing all its customers." *Id.*

The takeaway from *Texaco* is that, in cases where the tenant withholds possession after its lease is terminated, damages awarded under the unlawful detainer statutes are a unique breed. These damages grow not out of the lease or an implied contract—indeed, the holdover tenant is,

16

at that point, a trespasser—but are statutory damages which arise from the tenant's unlawful withholding of the property. The metes and bounds of the damages are highly fact specific. The straightforward component of unlawful-detainer damages are the rental value of the property for the time the property is unlawfully detained. 68 Am. Jur. *Proof of Facts* 3d 1 (2002). That said, in some cases, a landlord may receive "special damages" occasioned by the tenant's failure to surrender the premises. C.S. Patrinelis, Annotation, *Measure of Damages for Tenant's Failure to Surrender Possession of Rented Premises,* 32 A.L.R.2d 582 (1953). Special damages can include, among other things, a landlord's lost profits and costs incurred by the unlawful detainer. *Id.*

The injury must be concrete and directly flow from the unlawful detainer: "Damages of a speculative or conjectural nature may not be recovered." *Id*. § 2 Unlike contractual damages, where foreseeability is determined at the time of contracting, special damages must have been foreseeable at the time of tenant's holding over. *See* Restatement (Second) of Property, Land. & Ten. § 14.6 (1977) ("the landlord . . . is entitled to recover from a tenant improperly holding over after the termination of his lease for the special damages caused by the holdover which the tenant could reasonably have foreseen at the time of his holding over would result from his conduct, and which the injured party could not reasonably have avoided, unless equitable considerations justify relieving the tenant of some or all of these damages."). These special damages must be actually suffered by the landlord, not the incoming tenant. *See* I.C. § 6-310; *see also* 68 Am. Jur. Proof of Facts 3d 1 (2002) ("While a holdover tenant may be liable in damages to the landlord, he cannot be held liable to an incoming tenant because the incoming tenant has not yet acquired an interest in the premises sufficient to permit him to sue the holdover tenant for damages; the incoming tenant is generally limited to bringing an action against the landlord for breach of contract.").

Here, if we assume that the district court awarded Peterbilt's damages under an unlawful-detainer statute, then such a finding is not supported by substantial, competent evidence. CLC is required to show that it personally suffered the damages allegedly suffered by Petertbilt. And CLC is required to show that such damages were the proximate and direct result of JTS's holding over, that JTS knew that such damages would result, and that such damages are not "speculative or conjectural." We are not convinced that CLC carried this burden.

17

As an initial matter, the Idaho Code explicitly requires that unlawful-detainer damages must be "alleged in the complaint and proved on the trial." I.C. § 6-316. Indeed, special damages must be specifically pled. *Stoddard v. Ploeger*, 42 Idaho 688, 690, 247 P. 791, 793 (1926) ("Special damages cannot be recovered unless expressly alleged."). CLC's amended complaint included an addendum which sought damages for: Peterbilt's monthly rent at its prior location for 3 months; CLC's property tax at the Property; utilities at an unspecified location; costs of Peterbilt's idle employees; damages to the building; and the costs of replacing the electric transformer.

To explain the addendum, CLC did not articulate which damages should be assessed under which theory. ("A detailed statement identifying the damages incurred by [CLC] to date as a result of [JTS's] unlawful detainer of the Property and of its breach of the Commercial Lease Agreement and the Lease Amendments is attached hereto . . . ."). The addendum itself fails to parse the damages. However, under the heading for its unlawful-detainer cause of action, CLC articulated which categories of damages it sought as unlawful-detainer damages:

> As a direct result of [JTS's] representation that it would not vacate the Property as required in the Notice of Termination, and [JTS's] use of the Property, and actual failure to vacate and surrender the Property on January 31, 2015, [CLC] incurred significant damages, including, without limitation, damages related to extending the term of its current lease on commercial property where it operates it [sic] Business in Idaho, together with other business-related damages incurred as a result of Plaintiff's delay in being able to utilize the Property as of Property Purchase Date. . . .

> Consequently, [CLC] is entitled to damages incurred as a result of [JTS's] unlawful use and/or possession of the Property during the timeframe beginning on the Lease Expiration Date and ending on the Approximate Vacation Date [February 12, 2015], trebled, together with attorney's fees and costs, each in an amount to be determined at trial.

As a result, the damages pled were CLC's "damages related to extending the term of its current lease on commercial property where it operates it [sic] Business in Idaho" and "other business-related damages incurred as a result of Plaintiff's delay in being able to utilize the Property as of Property Purchase Date . . ."

In light of these allegations, we can quickly define the temporal parameters of the unlawful-detention damages. While CLC argues on appeal that JTS unlawfully detained the premises until February 23, 2015 because the transformer remained on the premises, this argument is without merit. In its amended complaint, CLC argued for unlawful-detainer damages

18

incurred "during the timeframe beginning on the Lease Expiration Date and ending on [February 12, 2015]." JTS will be held to that claim on appeal. While it is true that the transformer was removed around 11 days after JTS vacated the premises on February 12, 2015, JTS did not reenter the property to remove the transformer. The transformer's presence on the property cannot be said to inhibit CLC's use and enjoyment of the property in the same manner as JTS's continued presence on the property would have. That JTS left the transformer bears on whether it violated its Lease, but does not extend JTS's unlawful detainer period. JTS's unlawful detainer of the property ceased when it vacated the property on February 12.

Next, CLC failed to produce substantial, competent evidence to show that Peterbilt's damages were actually suffered by CLC. CLC places too much weight on the CLC/Peterbilt lease as the basis for the district court's award of all of Peterbilt's losses as special damages. The district court's only findings on the Peterbilt Lease were that CLC "needed to have proof of a lease in order to close on the Property" and that CLC and Peterbilt "entered into a lease agreement sometime before [CLC] closed on the Property[,]" and that "Peterbilt wanted to occupy the Property on February 1, 2015 . . . . "

Yet, on appeal, CLC argues that it demonstrated it was liable to Peterbilt in its written closing argument. In that document, CLC cited to two provisions in its lease with Peterbilt to establish its liability:

> Under the Peterbilt Lease, CLC is liable for these costs incurred because of Peterbilt's delayed occupation of the Property. *Ex. 21 at § 11.2*, "Lessor Defaults" (stating that "any amount or amounts which Tenant advances on Lessor's behalf will be repaid by Lessor to Tenant"); *see also id.* at *§ 6.8*, "Interruption of Business" (reserving additional remedies).

Included with this sentence-long argument was a footnote which cited the testimony of Blake Jackson: "Even if CLC's resulting liability to Peterbilt is somehow not established under the Peterbilt Lease, the parties' unrebutted course of dealing shows that CLC will reimburse Peterbilt for all costs incurred because of Peterbilt's delayed occupation."

We cannot say that this nominal argument was sufficient to remove these damages from the realm of speculation. This is especially true when there is confusion as to the real party in interest. Indeed, CLC's complaint seems to imply that Peterbilt is the plaintiff. The record is plagued with a general confusion as to who was the actual plaintiff in this case. At various points, both parties appear to assume that Peterbilt is plaintiff, or that CLC, rather than Peterbilt, is the incoming tenant. More than simply confusing the issues, this demonstrates that these

19

damages are simply too speculative. Though clarified at some point, CLC did not assist in delineating the separate entities at trial. For example, Blake Jackson testified, "as a representative" of CLC. Yet, he also testified that CLC was actually owned by a separate trust in his father's and wife's name whereas he owned Boise Peterbilt outright. As a result, this trial featured the incoming tenant testifying on behalf of itself *and* the landlord. Under these circumstances, meticulous documentation and careful business practices would be required to make the damages ascertainable.

Yet, various errors and inconsistencies appear in the Peterbilt/CLC lease. For example, in certain provisions the lease term would last five years, where in others it would be ten. According to Blake Jackson, the CEO of Peterbilt and CLC, the Lease was a recycled version of one they had used for one of its Utah properties. In its list of definitions, the Peterbilt Lease stated that the "Commencement Date" of the Lease would be February 1, 2008. Jackson testified that this Lease agreement was signed "sometime in mid-December [2014]" in order to secure financing for the building, and that that the year "2008" should have been "2015" but that "2008" was a "typo." Yet, the Peterbilt Lease states that it was "entered into" and "executed . . . to be effective" on "June 1, 2015." And, in a section providing for rent adjustment "effective following fifty five (55) months from the Commencement Date," the date provided was "January 1, 2020." Simple math argues that January 1, 2020 is 55 months after June 1, 2015, but 58 months after February 2015. Given this, a reasonable reader might conclude that the "February 1, 2008" date was a typo, the other dates were proper, and that the entire February "Commencement Date" was incorrect. What's more, Jackson testified that he didn't know exactly when Peterbilt started paying rent to CLC. Rather, he knew "for sure that Caldwell Peterbilt paid directly to [CLC] beginning June 1." According to Jackson, this June date was the "effective date" of the CLC/Peterbilt lease. That's the date, Jackson said, Peterbilt would be "expensed" with rent. Prior to that, Peterbilt would make "distributions." Jackson could not say definitively whether these "distributions" were mortgage payments made directly to the bank, or paid to CLC, which then paid the bank. While this may have made sense for accounting purposes, it does little show a direct liability for rent under the lease.

Even if we look past these inconsistencies, merely citing these two provisions does not carry the burden to show that CLC suffered damages in the form of liability to Peterbilt. First, notably absent from the lease is any provision where CLC expressly promises to deliver

20

possession and assigns liability if CLC is unable to do so. CLC also did not point to any case law which implies such a covenant. The "Lessor Defaults" provision[4] gives the tenant an alternate course of action if the landlord fails to perform any of its obligations. This provision envisions Peterbilt performing the function that CLC was supposed to do, and then seeking repayment by demand or withheld rent. CLC did not pinpoint which obligation it failed to perform or how Peterbilt could have performed it for CLC and sought reimbursement. Likewise, the "Interruption of Business" provision[5] discusses the failure to supply "utilities or services" to the property. The provision anticipates a scenario in which the landlord fails to deliver utilities to the property and the tenant is unable to carry on its business activities. This provision presupposes that Peterbilt has possession of the premises. Again, Peterbilt's remedy would be perform that obligation, withhold rent, or, under this particular provision, terminate the lease.

CLC's broad gesture based on Jackson's testimony is likewise unconvincing. Jackson's testimony shows that he viewed the CLC/Peterbilt lease as creating this liability. But while intent of the parties may inform the interpretation of a contract, it does not allow a court to rewrite its terms. *See Bakker v. Thunder Spring-Wareham*, LLC, 141 Idaho 185, 191, 108 P.3d 332, 338

---

[4] That provision reads as follows:

> **Lessor Defaults.** If Lessor fails or neglects to keep and perform any of the covenants or agreements in this Lease on the part of Lessor to be kept and performed, Tenant may notify Lessor thereof and if Lessor does not cure such default within thirty (30) days (or such shorter period as may be reasonable under the circumstances, in the event of an emergency) after the dates of receiving such notice or if the default is of such character as to require more than thirty (30) days to cure, Lessor does not commence to cure such default within thirty (30) days and proceed with the cure with reasonable diligence), Tenant may, in addition to all other remedies now or hereafter afforded or provided by law, perform such covenant or agreement for or on behalf of Lessor or make good any such default, and any amount or amounts which Tenant advances on Lessor's behalf will be repaid by Lessor to Tenant on demand, together with interest thereon at the Interest Rate from the date of such advances to the repayment thereof in full, and if the Lessor does not repay any such amount or amounts upon demand, Tenant may, without forfeiture of its rights under this Lease, deduct the same, together with interest thereon as provided above, from the next installment or installments of rent to accrue under this Lease.

[5] That provision reads as follows:

> **Interruption of Business.** Notwithstanding any Excusable Delay, if an interruption or impairment of utilities or services provided to the Premises materially impairs Tenant's ability to conduct its business and Tenant closes its business in the Premises by reason thereof and such impairment and closure continues for three (3) consecutive days, beginning after the end of such 3-day period, all rent will abate until such utilities or services are reasonably restored to an extent to render the Premises tenantable. Lessor will use reasonable efforts to cause such utilities or services to be restored as soon as possible. If such impairment and closure continues for thirty (30) consecutive days, Tenant may, in addition to all other remedies now or hereinafter afforded or provided by law or this Lease, terminate this Lease.

(2005) ("Courts do not possess the roving power to rewrite contracts in order to make them more equitable.") (citing *Smith v. Idaho State Univ. Federal Credit Union*, 114 Idaho 680, 760 P.2d 19 (1988)). The testimony also shows that Jackson's various companies had an extensive practice of intercompany transfers but that it was his "rule" that "[a]ll entities must stand on their own." While that might be the practice, it is insufficient to prove any damages based on CLC's supposed liability for Peterbilt's damages.

To be sure, CLC's claim for damages based on its alleged liability to its incoming tenant is not far-fetched. Indeed, had Peterbilt sued CLC for failure to deliver possession of the premises upon the lease's alleged start date, prevailed, and been able to show that JTS was fully aware of the CLC/Peterbilt lease terms, this case might present a different question. 68 Am. Jur. Proof of Facts 3d 1 (2002) ("[W]here the tenant holds over with full knowledge of the landlord's contractual relationship with a new tenant, the holdover tenant may be liable to the landlord for any amount the incoming tenant recovers from the landlord for breach of their lease agreement."). That said, landlords often have defenses to such actions when a prior tenant improperly holds over because the landlord's failure to deliver is outside of its control. *See* 49 Am. Jur. 2d Landlord and Tenant § 418 (recognizing a split of authority of whether a landlord is liable to the tenant for damages stemming from failure to deliver possession when a prior tenant improperly holds over.).

Even so, CLC is still entitled to rent found due and for lost profits. However, the district court was incorrect to award damages based on rental value extending to April 5, 2015. While the district court was correct to point out that damages can be awarded for "a period subsequent to the unlawful detainer because the premises remains unoccupied," there is no evidence that Peterbilt terminated the CLC/Peterbilt lease. Therefore, the property was not "unoccupied" for want of a leased tenant, but was "unoccupied" because Peterbilt had yet to move its business. If Peterbilt wished to terminate the lease for failure to deliver possession, it could have pursued that avenue. But Peterbilt chose not to, and, as a consequence, was obligated to pay rent on the Lease. Thus, CLC cannot claim damages for the time period the building was vacant after JTS vacated.

However, rent and lost profits are available for the period of JTS's unlawful detainer. The district court found that CLC informed JTS it wished to have another tenant move in "ASAP." Thus, JTS could have "reasonably foreseen" that CLC would lose profits or rent if it held over on the lease. Thus, when JTS held over after receiving notice to quit the premises, damages

22

stemming from CLC's inability to lease the property are the "natural and probable" consequences of holding over. But the district court's award in this category must be revised. This calculation must take into consideration that JTS paid rent through February 15, and JTS was entitled to repayment of this sum after the lease was terminated. JTS is liable for the difference between its rate of rent ($7,730/month) and Peterbilt's rent ($8,000/month) for those twelve days. That is, JTS is liable to CLC for the amount of profits CLC lost in the form of rent payments from February 1, 2015, to February 15, 2015, because CLC was unable to rent the property to Peterbilt at the higher rate. JTS paid rent and enjoyed the premises for 12 days, and thus, only owes the profits for February 1–12. However, JTS paid, and did not enjoy the property for three days, so JTS is entitled to credit for February 13–15. The following should illustrate.

JTS's prorated rent rate:

$7,730 / 31 days[6] = $249.35 per day

Amount CLC owed JTS for three-day overpayment:

3 days[7] x $249.35 = $748.05

The CLC/Peterbilt prorated rent rate:

$8,000 / 28 days[8] = $285.71 per day

CLC's lost profits for the 12 days in February:

($285.71 – $249.35 = $36.36/day) x 12 = $436.32

Thus, at least for purposes of lost profits and rent found due under an unlawful-detainer theory, CLC actually owed JTS $436.32. However, we need to further assess the full scope of damages that were awardable in this case before we may compile a final ledger. *See* Section C.

3. <u>JTS breached the contract but did not breach the implied covenant of good faith and fair dealing.</u>

We now turn to the district court's second basis of liability and damages: the breach-of-contract claims. The district court ruled that JTS was liable for breach of contract because "it failed to vacate the property after its term expired; removed the transformer after the term expired . . . without [CLC's] permission; and failed to make repairs." In addition, the district court found that JTS breached the implied covenant of good faith and fair dealing "when [JTS] failed to pay the higher rent amount for the month-to-month option" and "failed to give timely

---

[6] There are 31 days between 1/15/15 and 2/15/15.
[7] JTS vacated the property on 2/12/15, but paid rent through 2/15/15.
[8] There are 28 days between 2/1/15 and 3/1/15.

notice of when it would vacate the Property." Again, without specifying which categories of damages were awarded under which theory, the district court entered damages as follows:

- $ 7,603.12 | Rent due under the Lease through April 15, 2015;
- $ 7,929.00 | Damages and costs caused by JTS's removal of the transformer;
- $ 2,600.00 | Costs to repair the property;
- $14,587.92 | Peterbilt's rent and triple-net expenses for its prior lease;
- $ 7,696.22 | Cost of Peterbilt's idle employee;
- $45,973.00 | Peterbilt's lost profits.

### a. Breach of Contract.

The district court ruled that JTS was liable for breach of contract because "it failed to vacate the property after its term expired; removed the transformer after the term expired . . . without [CLC's] permission; and failed to make repairs."

A breach of contract is the "non-performance of any contractual duty of immediate performance." *Indep. Lead Mines v. Hecla Mining Co.*, 143 Idaho 22, 28, 137 P.3d 409, 415 (2006). In other words, "[i]t is a failure, without legal excuse, to perform any promise which forms the whole or part of a contract." *Id.* A nonbreaching party may recover damages so long as the damages are "incidental to the contract and [] caused by its breach . . . ." *Suitts v. First Sec. Bank of Idaho, N.A.*, 110 Idaho 15, 22, 713 P.2d 1374, 1381 (1985). "Direct damages are always recoverable, and consequential losses must be compensated if it can be determined that the parties contracted with them in view." *Id.* "Lost profits are generally not recoverable in contract unless there is something in that contract that suggests that they were within the contemplation of the parties and are proved with reasonable certainty." *Silver Creek Computers*, 136 Idaho 879, 884–85, 42 P.3d 672, 677–78 (2002) (citing *Brown's Tie & Lumber Co. v. Chicago Title Co. of Idaho*, 115 Idaho 56, 764 P.2d 423 (1988)). The test for "reasonable certainty" has been held by this Court to require only that the damages be taken out of the realm of speculation. *Circle C Ranch Co. v. Jayo*, 104 Idaho 353, 356, 659 P.2d 107, 110 (1983).

We take up first the issue of the transformer. On appeal, JTS points to the provision of the Lease that requires the tenant to return the property to the condition it was in when JTS entered into the Lease. JTS argues that, under this provision, removing the transformer was required because it was installed after the commencement of the Lease. JTS also argues that the Transformer was a trade fixture, and thus, it was allowed to remove it within a reasonable

24

amount of time after the Lease terminated. In response, CLC contends that the district court determined that JTS breached "not because the [T]ransformer was considered an improvement, but because JTS failed to get permission to 'change any part of the premises'" as required under the Lease's "improvements" provision.

The Lease provided that the tenant must first obtain consent from the landlord to construct an "Improvement":

> **IMPROVEMENTS:** The lessee shall not reconstruct, remodel or change any part of the premises without consent of the Lessor, which consent shall not be unreasonable [sic] withheld or delayed.

Likewise, the Lease required JTS to surrender the premises in the same condition that it was in when the Lease began, but provided JTS the right to remove its trade fixtures:

> **SURRENDER OF PREMISES:** Upon the expiration of this agreements, the Lessee shall quit and surrender the premises in the same state of condition, reasonable wear and tear expected, that the premises was in at the beginning of this Agreement. Lessee shall be entitled to remove its trade fixtures and personal property upon the termination of the Lease.

As a threshold matter, CLC does not refute that the transformer is a trade fixture. We accept that concession. With that understanding, CLC's argument relying on the improvement section of the Lease must fail. In Idaho, "it is well established that specific provisions in a contract control over general provisions where both relate to the same thing." *City of Meridian v. Petra Inc.*, 154 Idaho 425, 439, 299 P.3d 232, 246 (2013) (quoting *Twin Lakes Vill. Prop. Ass'n v. Crowley*, 124 Idaho 132, 138, 857 P.2d 611, 617 (1993)). Here, the surrender-of-premises provision specifically states that JTS is *entitled* to remove its *trade fixtures* and does not condition that right on consent. Therefore, CLC's reliance on the "Improvements" provision, and the extent to which CLC claims the district court relied on it, is incorrect.

At issue is the district court's ruling that JTS is liable for removing the transformer after the term expired. We must determine whether the "upon the termination of the Lease" language required JTS to remove the transformer either (1) before the termination of the Lease, (2) before it surrendered the premises, or (3) within a reasonable amount of time after the termination of Lease.

Idaho has a statute for these situations:

> A tenant may remove from the demised premises, any time during the continuance of his term, anything affixed thereto for the purposes of trade, manufacture, ornament or domestic use, if the removal can be effected without

25

injury to the premises, unless the thing has, by the manner in which it is affixed, become an integral part of the premises.

I.C. § 55-308.

And this Court faced a similar question, under similar circumstances, in *Pearson v. Harper*, 87 Idaho 245, 392 P.2d 687 (1964). There, tenants operated a drug store on the leased premises and had installed a number of trade fixtures attendant to their business. *Id.* at 249, 392 P.2d at 688. The lease required the tenant to surrender the premise at the expiration of the Lease and pay $10 every day after expiration of the lease that possession was withheld. *Id.* The tenant, who was in the process of constructing a new building, did not remove the trade fixtures before the lease term expired. *Id.* However, the tenant still retained possession of the premises when the trade fixtures were removed after the lease term expired. *Id.* at 252, 392 P.2d at 690. The question on appeal was whether a tenant's failure to remove trade fixtures automatically converts ownership of those fixtures to the landlord. *Id.*

To begin its analysis, this Court gave a detailed history of how the law has developed in the area of trade fixtures, recognizing that "the liberality accorded a tenant upon removal of trade fixtures is nothing new to the law." *Id.* at 254, 392 P.2d at 691. We explained how different jurisdictions take different approaches to removal of trade fixtures. For examples, some jurisdictions hold "that a tenant may remove fixtures only during the time that he is holding under the terms of the lease." *Id.* (citing Annot., 6 A.L.R.2d 322). Others "recognize the rule that ordinarily a tenant may remove his trade fixtures or improvements during the period between the expiration of his lease term and his surrender of possession of the premises, provided his continued occupancy was not wrongful." *Id.* (citing 6 A.L.R.2d 329). Still others take the position that "trade fixtures or improvements are removable by the tenant after the expiration of the lease term, at least if the removal is made within a reasonable time."

In light of Idaho Code section 55-308 and the lease provision providing for payment in the event of a holdover, the *Pearson* court held that the tenant retained the right to remove the trade fixtures because possession had not yet been surrendered and the lease provided terms for the holdover period:

> As long as a tenant remains in possession of the premises and holds over the term provided by the lease, which also makes provisions for payment of a fixed sum for each day of holding over, it is our conclusion that he is still within the purview of the statute allowing him to remove his property 'any time during the

26

> continuance of his term.' Certainly, when the tenant remains in possession, no intent can be inferred that he is abandoning his property.

*Pearson v. Harper*, 87 Idaho 245, 254, 392 P.2d 687, 691–92 (1964). In the years since, many jurisdictions have followed a parallel course to *Pearson*. *See* Schoshinski, Robert S., American Law of Landlord and Tenant 314 § 5:30 (1980) (recognizing surrender of possession of the premises as the true "cut off point" for removing trade fixtures).

Here, JTS waived its right to remove the transformer because it failed to remove it before surrendering the premises. As explained above, a tenancy, in one form or another, continued until CLC terminated the lease. After that, JTS held possession as a trespasser, so its right to remove its trade fixtures rests not in the lease or the tenancy, but on the assumption that JTS did not intend to abandon a fixture present while it retained the property. However, unlike *Pearson*, JTS instructed Idaho Power to remove the transformer *after* it quit the premises. Upon JTS's exit from the property, CLC's reasonable expectations were that JTS intended to abandon whatever was left at the property. If JTS had communicated to CLC that it still needed to remove its trade fixture, but wished to surrender possession before it could be removed by Idaho Power, this would be a different story. If CLC denied the request, then JTS's option would be to remain in possession until it could remove the fixture. However, no such notice was given. Though the bend of the law favors allowing tenants to remove trade fixtures within a reasonable amount of time, that bend reaches its breaking point on these facts. A landlord, without any notice or communication from the tenant, is not subject to unannounced reclamation of trade fixtures after the tenant has surrendered possession after a period of unlawful detainer.

However, damages for improper removal of a trade fixture is limited to the value of the fixture at the time of removal. 35A Am. Jur. 2d Fixtures § 121 ("The measure of damages for the wrongful removal of a fixture attached to real property is the value of the fixture in its condition at the time of its removal."). Here, installation was part of the total cost of the transformer since it must be leased, so those costs are included as well. As a result, the district court correctly awarded damages to CLC for the transformer's improper removal. Thus, JTS was liable for the $7,929 it cost CLC to reinstall the transformer.

Next, we take up the question of whether the district court properly awarded damages based on JTS's failure to timely vacate the premises. Here, the general damages are the rental value of the property for the time that JTS remained on the property. Likewise, CLC's lost profits for the days it was unable to lease the property is fairly categorized as consequential

27

damages stemming from JTS's breach to timely surrender. However, these damages are to be calculated as explained in the unlawful-detainer section, and CLC cannot recover twice under this theory.

Next, we also rule out any and all of Peterbilt's damages under this category. For consequential damages to be awarded in favor of CLC against JTS for CLC's liability to Peterbilt, CLC would have to show that these damages were foreseeable *at the time of contracting* between JTS and Gilbert. *See Lamb v. Robinson*, 101 Idaho 703, 705, 620 P.2d 276, 278 (1980). Based on the record, we are not convinced that CLC was able to show this. The damages under this theory suffer the same speculative deficiencies outlined in our discussion for unlawful-detainer damage because they also rely on the CLC/Peterbilt Lease as proof of liability and damages.

Lastly, JTS does not dispute the district court's award of $2,600.00 in damages for costs to repair the property. As a result, we affirm that measure of damages.

b. *Breach of the covenant of good faith and fair dealing.*

The district court determined JTS breached the implied covenant of good faith and fair dealing when "it failed to give timely notice of when it would vacate the Property, and failed to pay the higher rent amount for the month-to-month option." JTS argues these two findings are at odds with the court's finding of an at-will tenancy. CLC argues that JTS breached the implied covenant of good faith and fair dealing because "JTS had a good faith obligation to give notice whether it would extend the Lease and for how long." CLC further claims that JTS deprived Gilbert and CLC of the higher rent of the month-to-month arrangement under the Extension Amendment.

The breach of the covenant of good faith and fair dealing occurs when a party undermines the benefit of a contract:

> No covenant will be implied which is contrary to the terms of the contract negotiated and executed by the parties. The covenant requires "that the parties perform in good faith the obligations imposed by their agreement," and a violation of the covenant occurs only when "either party violates, nullifies or significantly impairs any benefit of the contract"

*Thurston Enterprises, Inc. v. Safeguard Bus. Sys., Inc.*, 164 Idaho 709, 22–23, 435 P.3d 489, 502–03 (2019) (internal citations omitted).

Here, JTS did not breach the implied covenant of good faith and fair dealing by failing to pay $6,250 for the month-to-month arrangement under the Extension Amendment. By accepting

28

$6,000 in rent payments, Gilbert created a new tenancy at the lower rate. Though the parties had memorialized a possible arrangement for a month-to-month tenancy under the Extension Amendment, JTS did not exercise this option. So, while the implied-in-law tenancy and the month-to-month extension shared the same periodic intervals, Gilbert's acceptance of the $6,000-per-month rate established that sum as rent for the new tenancy. Thus, JTS did not breach the implied covenant of good faith and fair dealing by failing to pay the higher rent amount because the parties' conduct resulted in a new agreement implied in law.

Likewise, JTS did not breach the covenant of good faith and fair dealing by failing to give timely notice of its intention to vacate. JTS was not required to give notice of its intent to vacate prior to the unlawful detainer because Gilbert issued the termination notice. Once the unlawful detainer began, JTS no longer had a duty to give notice because JTS was effectively a trespasser at that point. In any event, it appears that JTS gave notice that it was vacating during the unlawful-detainer period via email. On these facts, the district court erred by finding that JTS breached the covenant of good faith and fair dealing by failing to give proper notice of the date it intended to vacate the property. Similarly, CLC's argument that JTS breached the covenant by failing to obtain CLC's consent to remove the transformer is unpersuasive. That JTS did not advise Idaho Power that it no longer owned the property is an ancillary issue. Idaho Power entered CLC's property to remove the transformer, not JTS. Thus, issues regarding lack of consent should be addressed to Idaho Power, not JTS.

## C. Revised Calculation of Damages

Based on the above, it's useful to construct a ledger to discern the appropriate measure of damages in this case:

CLC is entitled to damages for:

+ $   436.32 | Lost Profits for Rent during unlawful detainer/failure to vacate.

+ $ 2,600.00 | Costs to repair the property.

+ $ 7,929.00 | Cost to replace the transformer.

JTS is entitled to credit for:

- $   748.05 | JTS three-day overpayment on rent.

- $ 5,271.00 | JTS's Security Deposit

Once calculated, CLC is entitled to award of damages in the sum of:

= $ 4,946.27 | CLC's damages [$10,965.32] – JTS's credits [$6,019.05]

29

**D. The district court did not abuse its discretion in awarding attorney's fees to CLC but those fees must be revised on remand.**

The district court issued an order awarding costs and fees to CLC. In that order, the court awarded $3,379.20 in costs as a matter of right under Rule 54(d)(1)(C), declined to award discretionary costs, and awarded $150,000 in attorney's fees pursuant to the Lease and Idaho Code section 6-324. Among other arguments, JTS asserts that the district court erred by awarding attorney's fees under the contract because the district court found that the Lease had been terminated. JTS also argues that CLC failed to comply with the Idaho Rules of Civil Procedure by failing to include an attestation in its memorandum of costs. We determine that the district court did not abuse its discretion in awarding attorney's fees to CLC. However, in light of our decision in this case, the award is vacated with instructions to recalculate on remand to remove any fees incurred on behalf of Peterbilt.

Beginning with the first prong of the four-part *Lunneborg* standard, the district court correctly perceived the decision to award attorney's fees and costs as one of discretion by explicitly acknowledging its discretion and by denying discretionary costs. For the second prong, the district court acted within the outer boundaries of its discretion by awarding costs and fees that were requested and permissible under the relevant law. Third, contrary to JTS's protests, the district court acted consistently with the legal standards applicable to the specific choices available to it by awarding fees for work done on CLC's behalf under both the unlawful-detainer statute and the Lease.

As mentioned above, the terms of the Lease carried over to the new tenancy. *See* Restatement (Second) of Property, Land. & Ten. § 14.7 (1977) ("[T]he legal relationships of the landlord and tenant during the period in which the tenant improperly holds over after the termination of the lease are the same as during the period of the lease, except to the extent a modification of the legal position of one or the other is required by the circumstances of the holding over."); 49 Am. Jur. 2d Landlord and Tenant § 167 ("[W]hen a tenant holds over beyond the expiration of the lease, and the lessor does not treat the tenant as a trespasser by evicting him or her, the parties are deemed to have continued the tenancy under the terms of the expired lease."). As such, the attorney's fees provision of the Lease remained in force:

> **ENFORCEMENT EXPENSES:** The losing party in any court action brought to enforce any of the provisions of or to collect any sums due under the terms of this Agreement shall pay the prevailing party in such action in all trial and appellate

30

courts, a reasonable attorney's fee to be fixed by such court, in addition to the costs allowed by law.

While JTS points out that a party who terminates a contract generally may not then avail itself of the attorney's fees provision, that general rule finds no purchase when a tenant holds over, the landlord then gives notice of termination of the lease and must file an unlawful-detainer action because the tenant refuses to vacate. This is especially true when the provision the landlord seeks to enforce is only triggered by the expiration or termination of the lease. Here, CLC sued, in part, to recover damages on a breach of contract claim under the "Surrender of Premises" provision:

> **SURRENDER OF PREMISES:** Upon the expiration of this agreement, the Lessee shall quit and surrender the premises in the same state of condition, reasonable wear and tear expected, that the premises was in at the beginning of this Agreement. Lessee shall be entitled to remove its trade fixtures and personal property upon the termination of the lease.

Thus, the district court did not err by relying on the Lease as a basis for attorney's fees.

Likewise, the Idaho Code explicitly provides for attorney's fees in unlawful-detainer actions. *See* Idaho Code § 6-324 ("In any action brought under the provisions of this chapter, except in those cases where treble damages are awarded, the prevailing party shall be entitled to an award of attorney fees."). Here, the district court declined to award treble damages. This provision is broad enough to encompass a claim for damages under the unlawful detainer statute. In light of the Lease and Idaho Code section 6-324, there are contractual and statutory bases for awarding attorney's fees for both the unlawful detainer and breach of contract claims. To conclude the abuse-of-discretion inquiry, the district court's order shows that it reached its decision by the exercise of reason because the district court went through each of Idaho Rule of Civil Procedure 54(e)(3)'s factors in awarding the fees.

Next, JTS's argument that CLC's attorney's attestation failed to comply with the Rule's mandate was heard and rejected by the trial court. JTS is correct that the Idaho Rules of Civil Procedure provide that a party must state that the memorandum is correct to the best of the party's knowledge:

> Memorandum of Costs. At any time after the verdict of a jury or a decision of the court, but not later than 14 days after entry of judgment, any party who claims costs may file and serve on adverse parties a memorandum of costs, itemizing each claimed expense. The memorandum must state that to the best of the party's knowledge and belief the items are correct and that the costs claimed are in compliance with this rule. Failure to timely file a memorandum of costs is a

31

> waiver of the right to costs. A memorandum of costs prematurely filed is considered as timely.

I.R.C.P. 54(d)(4). JTS's main contention was that CLC failed to recite the Rule's language verbatim. However, the district court reasoned that CLC's memorandum, when viewed alongside the CLC's attorney's sworn affidavit, substantially complied with the rule. CLC's attorney also submitted a supplemental affidavit which provided the language from the rule verbatim. The district court found that, when viewed together, the documents "substantially complied" with the certification requirement of Rule 54(d). We have held on prior occasion that an affidavit can meet the requirements of Rule 54. *Great Plains Equip., Inc. v. Nw. Pipeline Corp.*, 132 Idaho 754, 775, 979 P.2d 627, 648 (1999). While it would be the best practice to faithfully recite the rule's language in the affidavit, on the facts of this case, we cannot say that the district court abused its discretion by determining CLC substantially complied with Rule 54's certification requirement.

In sum, the district court did not abuse its discretion in awarding attorney's fees to CLC. However, on remand, the district court must delineate between fees awarded for work done on CLC's behalf and work done on Peterbilt's behalf. In light of our decision in this case, only those fees attributable to representing CLC's interests in this litigation, as opposed to those attributable to presenting Peterbilt's claim, are awardable.

### E. Neither party is entitled to attorney's fees on appeal because each party prevailed in part.

Both parties request attorney's fees on appeal. JTS asks this Court for attorney fees on appeal as the prevailing party under the Lease and Idaho Code section 6-324. CLC asks for attorney fees on appeal under Idaho Code section 6-324, Idaho Code section 12-120(3), and under the "Enforcement Expenses" provision under the Lease.

All the authority cited requires the recipient of attorney's fees to be the prevailing party on appeal. Because JTS has "prevailed" in the sense that they have reduced damages against them, and because CLC has "prevailed" in that many aspects of the district court's judgment were upheld, both parties have prevailed on appeal. As a result, we decline to award costs or attorney's fees to either party on appeal. *See Keller v. Inland Metals All Weather Conditioning, Inc.*, 139 Idaho 233, 241, 76 P.3d 977, 985 (2003) ("Because both parties have prevailed in part on appeal, we will not award attorney fees on appeal.").

## V.    CONCLUSION

For the reasons stated above, we affirm the district court's ruling that JTS failed to exercise the 6-month option to extend. We also affirm the district court's decision to allow the contract claims to be heard alongside the unlawful-detainer claim for damages. We affirm the district court's decision to award rent and lost profits to CLC for JTS's unlawful detainer; however, we find that the district court erred by awarding CLC damages for Peterbilt's lost profits. We affirm the district court's ruling that JTS was liable for breach of contract for failure to timely remove the transformer, repair damages, or timely vacate. We affirm the district court's determination that JTS is liable for damage to the property, the cost of the transformer, and CLC's lost profits stemming from failure to timely vacate. However, no damages based on Peterbilt's lost profits should have been awarded under that theory. Lastly, the district court did not abuse its discretion in awarding attorney's fees to CLC but the court must revise that award on remand. As a result, we vacate the district court's amended final judgment and its order of attorney's fees. We remand for reentry of damages consistent with Section D of this opinion and instruct the district court to reconsider its order of attorney's fees in light of this decision.

Justices BEVAN and MOELLER **CONCUR**.

Justice BRODY, concurring in part and dissenting in part.

I do not join the entirety of Section D of the Court's opinion regarding the district court's award of attorney's fees. I agree that the district court's order awarding attorney's fees to CLC must be vacated and the case remanded to the district court. The scope of the remand is where I disagree with the majority. Given the far-reaching scope of our opinion today, the district court should be instructed to start its attorney's fees analysis from square one – is there a prevailing party – since Johnson has been successful in reducing the damages awarded against it to a small fraction of the damages sought by CLC. It should not be taken as a given that CLC is the prevailing party particularly since our record on appeal is incomplete and there may be offers of judgment that need to be taken into consideration. Moreover, even if the district court were to conclude that CLC prevailed the Court has made it clear in the past that "where one party has been determined to be the overall prevailing party in the litigation and by statute or contract the prevailing party is entitled to an award of attorney fees on all claims asserted in the litigation, the award of reasonable attorney fees is not required to be limited to the claims upon which the prevailing party prevailed." *Advanced Med. Diagnostics, LLC v. Imaging Ctr. of Idaho, LLC*,

33

154 Idaho 812, 815–16, 303 P.3d 171, 174–75 (2013). We are not in a position to determine in the first instance how attorney's fees should be apportioned between the parties for work done before the district court.

Justice STEGNER **CONCURS**.